Vacated by Supreme Court, June 27, 2005

**Volume 1 of 2**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JEFFREY CLAYTON KANDIES,
*Petitioner-Appellant,*

v.

MARVIN POLK, Warden, Central
Prison, Raleigh, North Carolina,
*Respondent-Appellee.*

No. 03-9

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-99-764-1)

Argued: June 2, 2004

Decided: September 24, 2004

Before MICHAEL, TRAXLER, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Gregory wrote a separate opinion and announced the judgment. Judge Michael wrote an opinion concurring in the judgment. Judge Traxler wrote an opinion concurring in the judgment.

---

### COUNSEL

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appellant.

Edwin William Welch, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Matthew Stiegler, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant.

## OPINION

GREGORY, Circuit Judge, writing separately in parts I, II, III, IV and announcing the judgment in part V:

Petitioner-appellant Jeffrey Clayton Kandies was sentenced to death after being found guilty by a North Carolina jury of the first-degree rape and first-degree murder of Natalie Lynn Osborne, the four-year-old daughter of his fiancee, Patricia Craven. Following exhaustion of his rights of review in the North Carolina courts, Kandies filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Middle District of North Carolina asserting fourteen grounds for relief. Pursuant to the Federal Magistrate Act, 28 U.S.C. § 636(b)(1)(B), the district court referred Kandies's habeas petition to a magistrate judge. The magistrate judge reviewed Kandies's claims and recommended that Kandies's habeas petition be denied. After Kandies objected to the magistrate judge's recommendation, the district court reviewed *de novo*, as required by the Federal Magistrate Act, *id.* § 636(b)(1), and adopted the magistrate judge's recommendation. In addition, the district court declined to issue Kandies a certificate of appealability for any of his claims. We subsequently issued Kandies a certificate of appealability for his claims that (1) his trial counsel rendered ineffective assistance during the penalty phase by failing to investigate whether he was sexually abused as a child and (2) the North Carolina Supreme Court erred by concluding that the State's use of peremptory challenges to strike prospective African American jurors was not violative of the Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79 (1986). For the reason's that follow, we affirm the district court's denial of Kandies's habeas petition.

## I.

On Easter Monday, April 20, 1992, Kandies, who is a Caucasian American, went to the home of Patricia Craven, who was his fiancee

at the time and the mother of his one-year-old son, Jeremy. At approximately 4:45 p.m., Kandies left Ms. Craven's home to go to the grocery store, which is around the same time that Ms. Craven last saw her daughter, Natalie, alive. At approximately 7 p.m., Kandies, who had not returned to Ms. Craven's home, went to a small convenience store located about one-half mile from Ms. Craven's home. While inside the convenience store, Kandies complained to the clerk, Carolyn Wood, that he hurt his hand fighting with his brother. In response, Wood, who noticed that Kandies's hand was beginning to swell, suggested that Kandies have his hand examined by a medical technician that happened to be inside the store. Kandies, however, declined to have the medical technician examine his hand and immediately left the store. Thereafter, Kandies returned to Ms. Craven's home at approximately 7:30 p.m.

Upon arriving at Ms. Craven's home, Kandies was informed that Natalie could not be located. Consequently, Kandies contacted the Asheboro Police Department and reported Natalie missing. In response to Kandies's telephone call, the Asheboro Police Department conducted an extensive, but unsuccessful, search for Natalie on the evening of April 20th.[1] Nonetheless, the Asheboro Police Department learned through its search and investigation that Ms. Craven and Natalie's father, Ed Osbourne, were involved in a custody dispute. Based on this information, the Asheboro Police Department began to suspect that Ms. Craven and Kandies may have falsely reported Natalie missing in an effort to prevent Ed Osbourne from gaining custody of Natalie. As a result, the Asheboro Police Department undertook efforts on April 21st, the day after Natalie was reported missing, to determine whether Ms. Craven and Kandies were hiding Natalie. As part of these efforts, the Asheboro Police Department requested Kandies's permission to search his apartment, which was located approximately ten miles from Ms. Craven's home in the town of Randleman, North Carolina. After Kandies consented to the search, the Asheboro Police Department searched Kandies's apartment and concluded that Natalie was not there.

---

[1]During this search, Kandies returned to the convenience store located near Ms. Craven's home and asked Wood whether she had seen Natalie. Although she had not seen Natalie, Wood did notice that Kandies had black garbage bags in the back of his truck.

In addition to searching Kandies's apartment, the Asheboro Police Department brought Ms. Craven and Kandies in for questioning on April 22nd. After being questioned and released by the Asheboro Police Department, Kandies returned to Ms. Craven's home, where she immediately began to question him about Natalie's disappearance. As a result, Kandies told Ms. Craven that he accidentally hit Natalie with his truck as he departed for the grocery during the early evening of April 20th. Kandies also told Ms. Craven that he panicked after hitting Natalie because he was drinking and thus decided to take Natalie to his apartment, where he would be able to clean her off and determine the extent of her injuries. Kandies further told Ms. Craven that Natalie was making gurgling noises on the way to his apartment and that her head did not look right. Lastly, Kandies told Ms. Craven that, after trying to clean Natalie up, he placed Natalie's body and her clothes in a garbage bag that he hid in a bedroom closet.

Immediately after speaking with Kandies, Ms. Craven contacted the Asheboro Police Department and described what she had been told by Kandies. The Asheboro Police Department thereafter took Kandies into custody, where, after being read his *Miranda* rights, he provided two separate statements detailing the events of April 20th. In addition, Kandies provided the Asheboro Police Department information about the location of Natalie's body and consented, in writing, to a second search of his apartment. Accordingly, the Asheboro Police Department searched Kandies's apartment and found Natalie's body in a plastic bag hidden in a bedroom closet under a pile of clothes and carpet pieces. The plastic bag found by the Asheboro Police Department also contained Natalie's bloody playsuit and underpants, which were both turned inside out.

After Natalie's body was recovered, Dr. Thomas Clark, a forensic pathologist, performed an autopsy, which revealed that there were blunt force traumas on Natalie's head, neck, skull, back and both sides of her body. In addition, Dr. Clark's autopsy revealed that some of the bruises on Natalie's body were small and rounded and distributed in a pattern that suggested they were caused by an adult hand. Moreover, Dr. Clark's autopsy revealed that there were injuries to Natalie's vaginal area. Specifically, Dr. Clark found that (1) both sides of Natalie's vagina, which was full of blood, were bruised, (2) blunt force trauma caused a tear in the back of Natalie's vagina, and

(3) Natalie's vagina opening was gaping. In light of these injuries to Natalie's vaginal area, Dr. Clark opined that Natalie had been sexually assaulted at or about the time of her death.

Based on the findings of Dr. Clark's autopsy, the Asheboro Police Department brought Kandies in for further questioning on the evening of April 23rd. During this interrogation, the officers investigating Natalie's death mentioned that there was a possibility that she may have been sexually assaulted. In response, Kandies stated: "'I told [Ms. Craven] you were going to say I did something like that to Natalie.'" *State v. Kandies*, 467 S.E.2d 67, 74 (N.C. 1996)(quoting Kandies's statements to police). Thereafter, Kandies provided the Asheboro Police Department with a written statement denying that he sexually assaulted Natalie. In his written statement, Kandies also asserted that he took Natalie to his house, took her clothes off and placed her inside the bathtub to determine the extent of her injuries. Kandies further asserted in his written statement that he was unable to handle the situation and as result may have strangled Natalie. In addition to Kandies's written statement, the Asheboro Police Department completed a suspect rape kit on Kandies, which included samples of head and pubic hair, saliva and blood. Moreover, a forensic serologist conducted a luminal and blood test on Kandies's apartment and truck, which revealed the presence of blood in several areas of the apartment and on the interior of the truck's passenger door.

On May 11, 1992, Kandies was indicted by a grand jury in the Randolph County Superior Court for the first-degree murder of Natalie. On July 13, 1992, Kandies was also indicted in the Randolph County Superior Court for the first-degree rape of Natalie. On April 4, 1994, jury selection commenced for Kandies's capital trial. During jury selection, the State exercised its peremptory challenges to strike nine prospective African American jurors. On each occasion, Kandies's trial counsel asserted that the State was striking these prospective jurors because of their race and was thus acting in contravention to the Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79 (1986). In response, the State voluntarily put forth race neutral reasons for peremptorily challenging each of the nine prospective African American jurors. After listening to the reasons proffered by the State, the Randolph County Superior Court denied all of the *Batson* challenges raised by Kandies's trial counsel. At the end of jury selec-

tion, the twelve member jury empaneled for Kandies's capital trial included two African Americans.

After the jury was empaneled, Kandies was tried during the April 4, 1992 criminal session of the Randolph County Superior Court. During the guilt phase, Kandies's trial counsel did not present any evidence to rebut the State's case-in-chief. Consequently, Kandies was found guilty, on April 20, 1994, of the first-degree murder and first-degree rape of Natalie. After the jury rendered its guilty verdict, the court scheduled Kandies's sentencing hearing for the following day. At Kandies's sentencing hearing, his trial counsel presented the testimony of ten witnesses, among which included Dr. Brian Glover and Dr. Claudia Coleman, clinical psychologists, and Kandies's mother, Peggy Kandies.[2]

Dr. Glover, who met with Kandies on three separate occasions for approximately three hours each time,[3] testified that Kandies suffered

---

[2]Kandies's trial counsel also called the following witnesses: (1) Jodie Griffen, Kandies's former landlord in Bath, Maine, who testified that Kandies "was a very considerate father . . . very understanding . . . [who] came home from work . . . [and] played with [his children] . . . took them for rides . . . was always there for them," J.A. 1039; (2) Ken Curtis, a driving instructor for one of Kandies's former employers, who testified that Kandies was able to complete a six week driving course in two weeks and adored his family, *id.* at 1045; (3) Samuel Hoover, a clerk at a local alcohol store, who testified that Kandies purchased a twelve pack of beer three to four times a week, *id.* at 1049; (4) Thomas L. McIver, a detective for the Asheboro Police Department, who testified that a check of Kandies's criminal record only revealed a conviction for driving while impaired, *id.* at 1076-83; (5) Brian Kennedy, Kandies's childhood friend, who testified that he saw Kandies's step-father drunk and that Kandies was upset when he found out his step-father was not his biological father, *id.* at 1143-46; (6) Douglas Cattell, Jr., Kandies's childhood friend, who testified that Kandies was a "perfect" father and that he and Kandies drank beer and smoked marijuana together, *id.* 1147-52; and (7) John Gregory, Jr., Kandies's childhood friend, who testified that Kandies was a caring and concerned father. *Id.* at 1153-57.

[3]In addition to meeting with Kandies on three occasions, Dr. Glover conducted telephone interviews with three of Kandies's acquaintances: (1) Timothy Thompson, a childhood friend of Kandies, who indicated

from severe alcohol dependence. In doing so, Dr. Glover stated that Kandies (1) began consuming alcohol and marijuana on a regular basis by the age of fourteen and on a daily basis by the age of seventeen, (2) consumed approximately twelve to twenty-four beers on a daily basis in the years immediately preceding Natalie's murder, and (3) was so intoxicated on the day of Natalie's murder that his judgment was impaired and he could not control his emotions. In addition, Dr. Glover opined that on the day of Natalie's murder Kandies was suffering from a mental disorder and that his ability to appreciate the criminality of his conduct was impaired. Dr. Glover's investigation into Kandies's background, however, did not uncover any childhood sexual abuse or indicia that Kandies may have been sexually abused as a child.

Dr. Coleman, who has considerable experience performing psychological evaluations on criminal defendants, testified that she met with Kandies on two separate occasions for approximately three hours each time. Dr. Coleman also testified that during these meetings she conducted several psychological tests on Kandies, such as screening for intelligence and neurological impairments. Dr. Coleman further testified that she reviewed Kandies's school records, work records, military records, and police reports from the investigation of Natalie's death. Based on her review of these records and meetings with Kandies, Dr. Coleman opined that Kandies suffered from a personality disorder and alcohol dependence. Dr. Coleman also opined that Kandies suffered from emotional and mental disturbances that impaired his judgment on the date of Natalie's death. Like Dr. Glover, however, Dr. Coleman's investigation into Kandies's background did not uncover childhood sexual abuse or indications that he may have been sexually abused.

Peggy Kandies testified that her son became extremely angry for a period of time when he learned at the age of fourteen that his step-

---

that he and Kandies consumed drugs and alcohol together until approximately 1980; (2) Samuel Hoover, who was employed at the convenience store where Kandies customarily purchased his alcohol; and (3) Linda Loflin, who was present at Ms. Craven's home on the night that Natalie disappeared and indicated that Kandies was intoxicated and angry at the time.

father, Steve Kandies, was not his biological father and that his true biological father was dead. She also testified that when Kandies was a child, he saw his step-father verbally and physically abuse her. She further testified that Kandies's step-father was an alcoholic. Lastly, Peggy Kandies testified that Kandies was a loving father, whose children visited him in prison following his arrest for Natalie's death, and that he had served in the military. She did not, however, testify, or indicate to Kandies's trial counsel, that Kandies was sexually abused as a child.

After Kandies's trial counsel presented its mitigating evidence, the State called Ms. Craven as its sole witness during the penalty phase of Kandies's trial. Ms. Craven testified that she did not live with Kandies and that she never gave Kandies blank permission to take Natalie to his apartment.

Based on the evidence presented during the penalty phase of Kandies's trial, the jury found two aggravating factors: (1) Kandies murdered Natalie during the commission of first-degree rape and (2) the murder of Natalie was especially heinous, atrocious or cruel. The jury also found three of the five proposed statutory mitigating factors[4] and eighteen of the proposed twenty-eight nonstatutory mitigating factors.[5]

---

[4]The three statutory mitigating factors found by the jury were: (1) Kandies did not have a significant criminal history; (2) Kandies murdered Natalie while suffering from a mental or emotional disturbance; and (3) Kandies's capacity to appreciate the criminality of his conduct or conform to the requirements of the law was impaired.

[5]The eighteen nonstatutory mitigating factors found by the jury were: (1) Kandies expressed remorse when describing the events of April 20th to Ms. Craven on April 23rd; (2) Kandies expressed remorse when speaking with police on April 23rd; (3) Prior to being placed under arrest, Kandies contacted the Asheboro Police Department to inform it of the location of Natalie's body; (4) Prior to being placed under arrest, Kandies contacted the Asheboro Police Department to accept responsibility for Natalie's death; (5) Kandies voluntarily waived his right to have an attorney present when speaking with police on April 23rd; (6) Kandies voluntarily accepted responsibility for Natalie's death when speaking with police on April 23rd; (7) Kandies was a chronic and long term substance abuser; (8) Kandies suffered from acute substance abuse;

After balancing the aggravating and mitigating factors, the jury sentenced Kandies to death for the first-degree murder of Natalie.

On direct appeal, Kandies asserted, among other things, that the Randolph County Superior Court erred by overruling his *Batson* challenges to the State's use of peremptory challenges to strike nine prospective African American jurors. In rejecting Kandies's *Batson* claim, the North Carolina Supreme Court concluded that Kandies failed to satisfy his burden of establishing that the race neutral reasons proffered by the State were pretextual. *Kandies*, 467 S.E.2d at 75-77. Consequently, the North Carolina Supreme Court held that the Randolph County Superior Court "correctly ruled that the State did not exclude any [of the nine prospective African American] jurors based solely upon their race in violation of *Batson*." *Id.* at 76. Accordingly, the North Carolina Supreme Court affirmed Kandies's conviction and death sentence. The United States Supreme Court thereafter denied Kandies's petition for a writ of certiorari. *Kandies v. North Carolina*, 519 U.S. 594 (1996).

On September 26, 1997, Kandies filed a post-conviction motion for appropriate relief ("MAR") in the Randolph County Superior Court asserting, among other things, that his trial counsel rendered ineffective assistance during the penalty phase by failing to investigate whether he was sexually abused as a child. In support of this claim, Kandies submitted an affidavit alleging that he was sexually abused by his uncle, Ronald Kandies, when he was six years old:[6]

---

(9) Kandies had a troubled childhood; (10) Natalie's murder was out of character for Kandies; (11) Kandies was led to believe that his step-father was his biological father until the age of fourteen; (12) Kandies never had a positive role model; (13) Kandies suffers from a personality disorder; (14) Kandies comes from a dysfunctional family; (15) Kandies witnessed as a child the verbal and physical abuse of his mother; (16) Kandies's step-father is an alcoholic; (17) Kandies suffered from a history of depression; and (18) Kandies was reared in an unstable environment.

[6]In his briefs before this Court, Kandies has included affidavits from his ex-wife, Lisa Frankes, and military friend, Stephen Sexton, in support of his assertion that he was sexually abused as a child by his uncle. How-

These incidents of sexual abuse took place when I was living in New York State. My uncle, who was an adult 15-20 years older than me, would touch my private parts with his hand. He would also make me touch his private parts. He would also take showers with me and fondle me while in the shower. My uncle would buy me toys such as GI Joe's [sic] in order to get me not to tell anybody about what he was doing to me. These traumatic experiences haunted me throughout my adult life.

J.A. 1371. In reviewing Kandies's ineffective assistance of counsel claim, the court noted that the affidavit submitted by his trial counsel demonstrated that the subject of Kandies's alleged childhood sexual abuse did not come up during the "numerous interviews [he had] with . . . Kandies, members of [Kandies's] family, friends and mental health professionals regarding items in . . . Kandies['] background that could be presented as mitigating factors." *Id.* at 1381. In addition, the court noted that Kandies "never told [his] trial counsel about alleged childhood sexual abuse." *Id.* at 1382. Moreover, the court concluded that the failure on the part of Kandies's trial counsel "to question [Kandies] about . . . childhood sexual abuse was not *per se* ineffective assistance." *Id.* at 1383. Consequently, the court held that Kandies's ineffective assistance of counsel claim was without merit. Accordingly, the court, after rejecting the other ineffective assistance of counsel claims raised by Kandies, denied Kandies's MAR without holding an evidentiary hearing. In doing so, however, the court did not make an express finding that an evidentiary hearing was not required to resolve any dispositive facts in dispute.

On November 5, 1998, the North Carolina Supreme Court granted Kandies's petition for a writ of certiorari for the limited purpose of remanding his MAR to the Randolph County Superior Court for reconsideration in light of its holding in *State v. McHone*, 499 S.E.2d

---

ever, because these affidavits were not presented to the state court when it adjudicated Kandies's ineffective assistance of counsel claim, we, as a federal habeas court, may not consider them in reviewing Kandies's habeas petition. *Wilson v. Moore*, 178 F.3d 266, 272-73 (4th Cir. 1999), *cert. denied*, 528 U.S. 880 (1999).

761, 762-64 (1998), which held, among other things, that a post-conviction court must make an express finding as to whether an evidentiary hearing is required to resolve dispositive facts in dispute. On November 30, 1998, Kandies filed an amended MAR seeking to raise several additional ineffective assistance of counsel claims. On April 29, 1999, the Randolph County Superior Court affirmed its prior denial of Kandies's MAR, expressly finding that an evidentiary hearing was not required because there were no disputes concerning any dispositive facts. In addition, the court declined to consider the additional claims raised in Kandies's amended MAR, finding that these claims were not authorized by the North Carolina Supreme Court's remand order and were procedurally barred under N.C. Gen. Stat. § 15A-1419. Kandies thereafter petitioned the North Carolina Supreme Court for a writ of certiorari, which was summarily denied on August 19, 1999.

On October 7, 1999, Kandies filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of North Carolina asserting fourteen grounds for relief. On March 8, 2000, the district court referred Kandies's habeas petition to a magistrate judge. On December 14, 2000, the magistrate judge issued a report recommending that Kandies's habeas petition be denied. On December 18, 2000, Kandies objected to the magistrate judge's recommendation. After granting Kandies's motion to extend time to file his objections to the magistrate judge's recommendations, the district court issued an order on March 4, 2003 accepting the magistrate judge's recommendation and declining to issue Kandies a certificate of appealability for any of the claims raised in his habeas petition. On March 23, 2004, we issued Kandies a certificate of appealability for his claims that (1) his trial counsel rendered ineffective assistance during the penalty phase by failing to investigate whether he was sexually abused as a child and (2) the State's use of peremptory challenges to strike nine prospective African American jurors violated *Batson*.

## II.

"We review *de novo* a district court's decision on a petition for writ of habeas corpus based on a state court record." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). Because Kandies filed

his habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), our *de novo* review is limited by the standards set forth by AEDPA. Under AEDPA, if a state court has resolved the merits of a claim for post-conviction relief, as is the case here, a federal court may not issue a writ of habeas corpus unless the state court's holding was "contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2).

In the present case, we must determine whether the state court's adjudication of Kandies's claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). To issue Kandies a writ of habeas corpus, however, we need not find that the state court's adjudication of his claims was both "contrary to" and an "unreasonable application" of clearly established federal law. In *Williams v. Taylor*, the Supreme Court expressly held that AEDPA's "contrary to" and "unreasonable application" clauses have independent meanings. 529 U.S. 362, 404-05 (2000). Thus, we may issue Kandies a writ of habeas corpus if we determine that the state court adjudicated his claims in a manner that was either contrary to *or* an unreasonable application of federal law.

A state court's adjudication of a claim is contrary to clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's adjudication of a claim constitutes an unreasonable application of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions, but unreasonably applies it to the facts of the particular case." *Id.* Because the Supreme Court has stated that an "*unreasonable* application of federal law is different from an *incorrect* application of federal law," *Williams v. Taylor*, 529 U.S. at 410, we may not issue Kandies a writ of habeas corpus solely because we determine in our "independent judgment that the state-court decision applied [a

Supreme Court] case incorrectly." *Prince v. Vincent*, 538 U.S. 634, 641 (2003)(quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)(per curiam)). Thus, in order to grant Kandies's habeas petition we must conclude that the state court's adjudication of his claims was not only incorrect, but that, it was objectively unreasonable.

## III.

I begin with Kandies's argument that his trial counsel rendered ineffective assistance during the penalty phase by breaching the duty to reasonably investigate mitigating evidence. Specifically, Kandies argues that his trial counsel breached the duty to reasonably investigate mitigating evidence, and thus rendered ineffective assistance, by failing to retain a mitigation expert and directly inquire about childhood sexual abuse.

## A.

In *Strickland v. Washington*, the Supreme Court set forth a two-part test that defendants must satisfy before succeeding on an ineffective assistance of counsel claim. 466 U.S. 668 (1984). First, a defendant must show that defense counsel's performance fell below an objective standard of reasonableness, the proper measure of which is prevailing professional norms. *Id.* at 687-88. Second, a defendant must show that he or she was prejudiced by defense counsel's objectively unreasonable performance. *Id.* at 687. In the context of a capital sentencing proceeding, such as the one before us, a defendant establishes prejudice by showing "there is a reasonable probability that, absent [his trial counsel's objectively unreasonable performance], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. To make such a showing, a defendant need not establish a reasonable probability that the entire jury would have voted against the imposition of a death sentence, but rather, that "there is a reasonable probability that *at least one juror* would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)(emphasis added). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Glover v. Miro*, 262 F.3d 268, 275 (4th Cir. 2001)(quoting *Strickland*, 466 U.S. at 694). In determining whether a defendant has carried his burden of showing there is a reasonable probability that at

least one juror would have declined to impose a death sentence if presented with certain mitigating evidence, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

Before turning to the merits of Kandies's claim, it is important to note that *Strickland*'s two-part test is an onerous one to satisfy because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. This strong presumption is justified by the fact that counsel is often forced to make instantaneous decisions without the hindsight that appellate courts, especially habeas courts, enjoy. *Id.* at 689-90. As the Supreme Court noted in *Strickland*: "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689.

## B.

The Supreme Court has expressly held that defense counsel has a professional "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. at 396; *see also Wiggins*, 539 U.S. at 523-34 (holding that defense counsel breached duty to conduct complete investigation of defendant's background); *Strickland*, 466 U.S. at 691 (stating that defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). In determining whether defense counsel breached this duty, "we must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 533 U.S. at 523 (internal citation and quotation marks omitted). It is also necessary to keep in mind that defense counsel is not required to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing" or "to present mitigating evidence at sentencing in every case." *Id.* at 533.

In the present case, Kandies asserts that his trial counsel breached the duty to thoroughly investigate his background by failing to retain the services of a mitigation expert.[7] This argument fails for several reasons. First, Kandies's argument, if accepted, would create a *per se* rule requiring defense counsel to retain a mitigation expert in every capital case. The Supreme Court, while using standards such as those set forth by the American Bar Association as guides for what is reasonable, has repeatedly declined to adopt a rigid checklist of things that defense counsel must do in *all* cases because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89. Moreover, the Court has expressly stated that the adoption of a rigid checklist for counsel's conduct "would interfere with the 'constitutionally protected independence of counsel' at the heart of *Strickland*." *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 689). Consequently, the Supreme Court has made it clear that defense counsel must be afforded the discretion to determine whether the retention of an expert will serve the interests of his or her client and, if so, what type of expert would best do so.

Second, Kandies's argument incorrectly assumes that the services of a mitigation expert are the exclusive means through which defense counsel can thoroughly investigate a defendant's background. While the services of a mitigation expert will undoubtedly prove useful in

---

[7]Kandies also contends that he received ineffective assistance because his court-appointed attorney that was primarily responsible for discovering and developing mitigation evidence, Scott N. Dunn, had never tried a criminal jury trial prior to Kandies's capital case. While I believe the Randolph County Superior Court should have appointed an attorney experienced in capital cases, Mr. Dunn's lack of experience does not establish *ipso facto* that he was ineffective. When considering an ineffective assistance of counsel claim, the attorney's actual performance is examined, rather than his or her experience, which is an indicator of the attorney's likely performance.

In addition, I note that Mr. Dunn was not the lead counsel in Kandies's trial and thus I presume, given that it has not been alleged otherwise, that he was supervised by a more experienced attorney.

many instances, they are by no means the only manner through which defense counsel can thoroughly investigate a defendant's background. For instance, there will be some circumstances where the assistance of lay persons, such as family, friends and colleagues, is more useful in discovering and presenting mitigating evidence than that of a mitigation expert. There will also be some instances where defense counsel's experience in trying capital cases and presenting mitigating evidence will render the services of a mitigation expert unnecessary. While the retention of a mitigation expert in these instances may nonetheless be advisable, I do not believe defense counsel should be required, or feel compelled, to do so.

Kandies also argues that his trial counsel failed to thoroughly investigate his background by not specifically inquiring into whether he was sexually abused as a child. In so arguing, Kandies asserts that his trial counsel had a duty to specifically inquire about childhood sexual abuse because numerous studies have found that men who commit acts of child abuse are far more likely than the general population to have been sexually abused as children. To the contrary, I believe the interests of criminal defendants are better served when defense counsel has the discretion to consider the circumstances of a particular case and determine whether a specific inquiry regarding childhood sexual abuse should be undertaken. As the Supreme Court has repeatedly stated, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89.

In reviewing counsel's conduct, I limit my inquiry to a determination of whether the state court was "unreasonable" in concluding that counsel's performance was objectively reasonable under prevailing professional norms. In this case, Kandies's trial counsel conducted "numerous interviews with . . . Kandies, members of [Kandies's] family, friends and mental health professionals regarding possible items in . . . Kandies's background that could be presented as mitigating factors." J.A. 1374. Despite these open-ended interviews, "the subject of child sexual abuse . . . was never raised."[8] *Id.* In addition, Kan-

---

[8]While I recognize that the trauma of childhood sexual abuse can cause victims to repress their memory of such abuse, the fact that Kandies

dies's trial counsel had two clinically trained psychologists, Drs. Grover and Coleman, investigate Kandies's background in hopes of discovering mitigating evidence. Dr. Grover, who focused primarily on the history of Kandies's substance abuse, interviewed Kandies on three separate occasions for approximately two hours each time and conducted telephone interviews with three of Kandies's acquaintances. However, Dr. Grover did not find any indicia of Kandies's alleged childhood sexual abuse. Dr. Coleman, a neuro and forensic psychologist, met with Kandies on two separate occasions for approximately three hours each time. During these meetings, Dr. Coleman screened Kandies for neurological and intelligence impairments. Moreover, Dr. Coleman reviewed Kandies's school records, work records, military records and police records related to the investigation of Natalie's death. Despite this comprehensive investigation of Kandies's background, Dr. Coleman did not find any indications that Kandies may have been sexually abused as a child.

As demonstrated above, Kandies's trial counsel thoroughly investigated Kandies's background for any mitigating evidence. Indeed, these efforts resulted in the jury finding twenty-one of the thirty-three mitigating factors presented by Kandies's trial counsel. Thus, I cannot conclude that the failure on the part of Kandies's trial counsel to inquire about Kandies's alleged childhood sexual abuse was due to a half-hearted investigation into Kandies's background. Accordingly, I conclude based on all of the circumstances of this case and the investigation conducted by Kandies's trial counsel, that the state court was not unreasonable in finding that his counsel's performance, despite not having retained a mitigation expert or asking a specific question about childhood sexual abuse, did not fall below an objective standard

---

never informed his trial counsel that he was, or believed he was, sexually abused is important because the Supreme Court has unequivocally stated that "what investigation decisions are reasonable depends critically" on "information supplied by the defendant." *Strickland*, 466 U.S. at 691; *cf. Barnes v. Thompson*, 58 F.3d 971, 979-80 (4th Cir. 1995)(stating that counsel "may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation"). This is especially true in the present case because nothing in Kandies's background could have alerted his trial counsel to his alleged childhood sexual abuse.

of reasonableness as measured by prevailing professional norms. *Strickland*, 466 U.S. at 688.

## C.

Even assuming *arguendo* that Kandies can show that his trial counsel's performance was objectively unreasonable, I, as well as my colleagues, find that Kandies is unable to establish that there is a reasonable probability that at least one juror would have weighed the aggravating and mitigating evidence differently had the jury been informed that Kandies was fondled by his uncle and forced to fondle his uncle in return while living for a period in New York. In imposing a death sentence, the jury found several mitigating factors related to Kandies's difficult childhood, *e.g.*, Kandies did not have a positive role model, came from a dysfunctional family, and was reared in an unstable environment. Nonetheless, the jury concluded that these and the other mitigating factors were outweighed by the two aggravating factors that it found, namely that Kandies murdered Natalie while raping her and that Natalie's murder was especially heinous, atrocious or cruel. I am not convinced, at least not to the point where I lack confidence in the outcome of Kandies's sentencing proceeding, *Strickland*, 466 U.S. at 694, that the jury, had it been informed that Kandies was fondled by his uncle and forced to fondle his uncle in return during the period that he lived in New York, would have balanced the aggravating and mitigating factors differently. While I in no way minimize Kandies's childhood sexual abuse, if it occurred, I am not convinced that the jury, once informed of Kandies's alleged childhood sexual abuse, would not have sentenced Kandies to death after having found him guilty of the rape and murder of his fiancee's four-year-old daughter and the half-sister of his one-year-old son, dumping her body in a plastic bag and then lying about the incident for a couple of days.[9] Clearly, the state court was not unreasonable in concluding likewise.

---

[9]I also note that the jury knew, through Kandies's statements to police, that he never admitted to having raped Natalie. Thus, he never accepted responsibility or demonstrated remorse for the rape of Natalie.

IV.

I now turn to Kandies's argument that the North Carolina Supreme Court's conclusion that the trial court properly overruled his objections to the State's use of peremptory challenges to remove nine prospective African American jurors is contrary to or an unreasonable application of the Supreme Court's holding in *Batson v. Kentucky*, 476 U.S. 79 (1986).

A.

In *Batson v. Kentucky*, the Supreme Court held that a defendant may raise an equal protection challenge to the State's use of peremptory challenges at his or her own trial by showing that the State used such challenges for the purpose of excluding members of the defendant's race.[10] 476 U.S. at 96. In so holding, the Supreme Court set forth a three-part test that trial courts are to employ in evaluating a defendant's allegation that the State has peremptorily challenged a prospective juror solely on the basis of race. First, a trial court must decide whether the defendant has made a *prima facie* showing that the circumstances surrounding the State's peremptory challenge of a prospective juror give rise to an inference that the juror was struck because of his or her race.[11] *Id.* at 96. Such an inference may be established by, *inter alia*, showing a pattern of peremptory challenges

---

[10]Similarly, the Supreme Court held in *Georgia v. McCollum* that the State may challenge a defendant's racially based use of peremptory challenges because "[j]ust as public confidence in criminal justice is undermined by a conviction in a trial where racial discrimination has occurred in jury selection, so is public confidence undermined where a defendant, assisted by racially discriminatory peremptory strikes, obtains an acquittal." 505 U.S. 42, 50 (1992). Moreover, the Court noted that "[r]egardless of who invokes the discriminatory challenge . . . the juror is subjected to [the harms caused by] open and public racial discrimination." *Id.* at 49.

[11]Originally, *Batson*'s requirement that a defendant establish a *prima facie* case of discrimination also mandated that the defendant show that he or she was a member of a "cognizable racial group" and that the State exercised peremptory challenges against members of the defendant's racial group. 476 U.S. at 96. This requirement, however, was eliminated in *Powers v. Ohio*, 499 U.S. 400, 415-16 (1991).

against non-Caucasian prospective jurors.[12] *Id.* at 97. Second, once the defendant has established a *prima facie* case of discrimination, the trial court must require the State to proffer a race neutral reason for striking the prospective juror. *Id.* The State's proffered reason need not be persuasive or even plausible because "'[u]nless a discriminatory intent is inherent in the [State's] explanation[ ] the reason offered will be deemed race neutral.'"[13] *Purkett v. Elem*, 514 U.S. 765, 768 (1995)(per curiam)(quoting *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991)(O'Connor, J., concurring in judgment)). Thus, the State need only put forth a race neutral reason that is clear, sufficiently specific and related to the particular case to be tried. *Batson*, 476 U.S. at 97-98. Finally, after the State has proffered a race neutral reason, the trial court must determine whether the defendant has carried his or her burden of proving that the State's peremptory challenge was motivated by purposeful discrimination, *i.e.*, that the State's proffered race neutral reason for striking a juror was pretextual.[14] *Id.* at 98.

In *Powers v. Ohio*, the Supreme Court extended the equal protection principle established in *Batson* by holding that an individual juror, while not having "a right to sit on any particular petit jury, . . . does possess the right not to be excluded from one on account of race." 499 U.S. at 409. This holding was primarily based on the Court's belief that "with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Id.* at 407. To ensure that a

---

[12]An inference that a prospective juror has been peremptorily challenged because of his or her race can also be established through the State's questions and statements during *voir dire*. *Batson*, 476 U.S. at 97.

[13]While the State's proffered reason need not be persuasive or even plausible, the State cannot rebut a defendant's *prima facie* case "merely by denying [it] had a discriminatory motive or 'affirm[ing] [its] good faith in making individual selections.'" *Batson*, 476 at 98 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)).

[14]Because a trial court's finding regarding purposeful discrimination will turn in large part on credibility determinations, it should be accorded great deference on review. *Batson*, 476 U.S. at 98 n.21. Thus, a trial court's finding regarding purposeful discrimination may not be overturned unless clearly erroneous. *Hernandez*, 500 U.S. at 365.

prospective juror's right to not be excluded from jury duty on the basis of race is vindicated, the Court further held that criminal defendants have standing to bring an equal protection claim asserting that a prospective juror's right not to be excluded from jury duty on the basis of race has been violated. *Id.* at 415. Moreover, the Court held that criminal defendants have standing to bring such challenges even when their race differs from that of the excluded juror because the failure to allow defendants of a different race to bring these claims "would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service." *Id.* Accordingly, Kandies, who is a Caucasian American, has standing to bring his *Batson* claim asserting that the State improperly excluded nine prospective African American jurors because of their race.

### B.

Because the State voluntarily responded to each of Kandies's *Batson* challenges, I presume that Kandies established a *prima facie* case of racial discrimination on each instance and thus turn directly to the State's proffered reasons for striking each of the nine prospective African American jurors. *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997). In doing so, I consider each of the State's peremptory challenges in turn.

### 1. Ms. Randleman

In response to Kandies's *Batson* challenge, the State asserted that it peremptorily struck Ms. Randleman because although her juror questionnaire "form indicate[d] that she had not been convicted of any criminal offense," a check of her criminal record revealed that she had "been convicted of worthless checks and two speeding violations." J.A. 131. In addition, the State asserted that Ms. Randleman "was hesitant on death penalty questions." *Id.* Such reasons undoubtedly constitute race neutral reasons that are clear, sufficiently specific and related to the case. *Batson*, 476 U.S. at 97-98. Consequently, once the State put forth these race neutral reasons, Kandies had the burden of establishing that they were pretextual. Kandies, however, failed to argue that the State's proffered reasons were pretextual. In fact, Kandies did not even rebut the State's proffered reasons when given the opportunity. Having failed to argue that the State's proffered reasons

were pretextual, Kandies waived his *Batson* challenge and thus I review it for plain error. *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1027 (4th Cir. 1998)("[W]e now follow the lead of other circuits that have held that the movant's failure to argue pretext constitutes a waiver of his initial objection."); *see also United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003)("If a defendant fails to rebut a race-neutral explanation at the time it was made, the district court's ruling on the objection is reviewed for plain error.").

For the district court's ruling to constitute plain error, Kandies must show that (1) an error occurred, (2) the error was plain, *i.e.*, obvious or clear, (3) the error affected substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 731-34, 736 (1993). Here, I find that the trial court did not err by overruling Kandies's *Batson* challenge to the peremptory removal of Ms. Randleman because the State proffered race neutral reasons that were clear, sufficiently specific and related to the case. *Batson*, 476 U.S. at 97-98. Because I find that the trial court did not commit an error in overruling Kandies's *Batson* challenge, I need not proceed with plain error review.

### 2. Ms. Jinwright

In response to Kandies's *Batson* challenge, the State asserted that it peremptorily struck Ms. Jinwright because "she has worked with three- or four-year-old children and was hesitant on the death penalty." J.A. 131. As previously noted, once the State put forth these race neutral reasons, Kandies had the burden of establishing that they were pretextual. Kandies, however, failed to argue that the State's proffered reasons were pretextual. Indeed, he did not even respond to the State's proffered reasons when afforded the opportunity. Consequently, I review this *Batson* challenge for plain error, which I do not find. *Davis*, 160 F.3d at 1027. The race neutral reasons proffered by the State were clear, sufficiently specific and related to the case, which is all that *Batson* requires in the second part of its three-part test. 476 U.S. at 97-98.

### 3. Ms. Massey

In response to Kandies's *Batson* challenge, the prosecutor stated that Ms. Massey was peremptorily challenged because she:

had trouble understanding me, and I think she has a hearing problem because she continuously answered with difficulty, and I had difficulty getting her to understand my questions, and so I excused Ms. Massey because of her hearing problems, and I had some difficulty understanding her answer to the questions I asked her.

J.A. 131. After the State set forth these race neutral reasons, Kandies had the burden of establishing that they were pretextual. However, as with Ms. Randleman and Ms. Jinwright, Kandies failed to even respond to the State's proffered reasons when given the opportunity. Consequently, I review this *Batson* challenge for plain error. *Davis*, 160 F.3d at 1027. In doing so, I find that the trial court did not err by overruling Kandies's *Batson* challenge because the State's proffered race neutral reasons were clear, sufficiently specific and related to the case. 476 U.S. at 97-98. Accordingly, I need not proceed with plain error review.

### 4 & 5.  *Ms. Rawlinson and Mr. McClure*

In response to Kandies's *Batson* challenge, the prosecutor stated that Ms. Rawlinson and Mr. McClure were peremptorily struck because:

Ms. Rawlinson had not even thought about the death penalty, certainly was not [sic] a strong opinion for or against the death penalty. And Mr. McClure was in a similar situation except that he also — my officer noticed that he nodded off at least twice. Not that I'm saying this was the most interesting part of the trial, but I certainly do not believe he was paying sufficient attention in this case, though. Also, I discussed the jury panel with the High Point Police Department, and they indicated Mr. McClure and Ms. Rawlinson would not be good jurors for this type of case.

J.A. 167. When asked by the court to elaborate on his proffered reasons for striking Ms. Rawlinson and Mr. McClure, the prosecutor asserted: "I asked most everybody and basically indicated [sic] anyone that they had any contact with prior to the trial. Primarily, the reason was they were weak on the death penalty." *Id.* at 168.

In assessing the State's proffered reasons, I begin by noting that it is completely proper for prosecutors to contact police to determine whether a prospective juror has a criminal record or has had any prior contact with police. I also note that prosecutors are free to solicit from police advice on a prospective jurors stance on the death penalty, as apparently was done here. In doing so, however, I observe that in most instances police will not have a basis upon which to render such advice. Of course, there may be some rare instances where police can advise prosecutors about a prospective jurors stance on the death penalty due to some prior contact where the prospective juror and police discussed at-length the death penalty or an officer heard the prospective juror discussing his or her views on the death penalty. Here, when given the opportunity, the State failed to set forth the basis upon which the High Point Police Department concluded that Ms. Rawlinson and Mr. McClure "would not be good jurors for this type of case" because "they were weak on the death penalty question." *Id.* at 167-68. Moreover, the State's assertion that the High Point Police Department indicated that Ms. Rawlinson and Mr. McClure were weak on the death penalty contradicts its observation, after questioning and observing Ms. Rawlinson and Mr. McClure, that they "were not a [sic] strong opinion for or against the death penalty." *Id.* at 167.

Accordingly, the State's assertion that it struck Ms. Rawlinson and Mr. McClure because the High Point Police Department "indicated [they] would not be good jurors for this type of case," *id.* at 167, raises suspicion.[15] Nonetheless, I conclude that this proffered reason was race neutral because a discriminatory intent is not inherent in this explanation. *Purkett*, 514 U.S. at 768. Because the State proffered this race neutral reason that was clear, sufficiently specific and at least arguably related to the case, *Batson*, 476 U.S. at 97-98, Kandies had the burden of establishing that it was pretextual, which Kandies failed to do. Kandies could have met his burden, for example, by establishing that the prosecution only discussed prospective African American jurors with the High Point Police Department or that the High Point Police Department's assertions were solely based on race.

---

[15]Unlike with four of the other seven prospective African American jurors that it struck, the State did not cite criminal history or possibility of criminal history when explaining its reasons for striking Ms. Rawlinson and Mr. McClure.

I am equally suspicious of the State's assertion that it removed Ms. Rawlinson and Mr. McClure because they did not hold a strong position on the death penalty. Such prospective jurors are exactly the ones that should be empaneled for a capital trial. *Morgan v. Illinois*, 504 U.S. 719, 735-36 (1992)(holding that defendant has right to remove for cause prospective jurors who would always impose a death sentence after finding a defendant guilty of a capital crime); *Wainwright v. Witt*, 469 U.S. 412, 424 n.5 (1985)(holding that "the State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths"). Nonetheless, because a discriminatory intent is not inherent in this proffered reason, I must deem it race neutral. *Purkett*, 514 U.S. at 768. Accordingly, Kandies had the burden of showing that this race neutral reason, which was clear, sufficiently specific and related to the case, *Batson*, 476 U.S. 97-98, was pretextual. This, however, Kandies failed to do.

The State's last reason for striking Mr. McClure—his lack of attentiveness—clearly satisfies *Batson*. It is a race neutral reason that is clear, sufficiently specific and related to the case. A juror's attentiveness is clearly pertinent and vitally important to a capital case because jurors are being asked to make a decision between life and death.

### 6.  Mr. Campbell

In response to Kandies's *Batson* challenge, the prosecutor stated that he used a peremptory challenge to strike Mr. Campbell because:

> [Mr. Campbell] did not believe in the death penalty, and considering that [it] is a possible punishment in this case I just didn't feel that he would be a qualified juror in the case. It would not matter what his answer would be to the question about following the law. Furthermore, a record check indicates that a person named Fred Campbell has a prior common law robbery conviction, but without a file here I didn't feel I [had] . . . enough evidence to challenge him [on] this point.

J.A. 583. Given that, as discussed above, the Supreme Court has held that "the State may exclude from capital sentencing juries that 'class' of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths," *Wainwright*, 469 U.S. at 424 n.5, I find that the State's proffered race neutral reason satisfied *Batson* because it was clear, sufficiently specific and related to the case. 496 U.S. at 97-98. Thus, Kandies had the burden of establishing that this reason was pretextual, which he attempted to do by noting that Mr. Campbell stated that he would be able to follow the law despite his opposition to the death penalty. This argument, however, fails to establish that the State's proffered reason for peremptorily striking Mr. Campbell was pretextual because "a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining . . . dogmatic beliefs about the death penalty would prevent him or her from doing so." *Morgan*, 504 U.S. at 735.

### 7.   Mr. Hines

In response to Kandies's *Batson* challenge, the State asserted that it exercised a peremptory strike to remove Mr. Hines because Mr. Hines was "worried about his employment and his loss of income. . . . [H]e ha[d] never thought about the death penalty. . . . [and] records indicate that he had prior convictions for driving while impaired and driving while [sic] license revoked under his birth date." J.A. 605. In response to the State's proffered reason, Kandies's trial counsel renewed a motion requesting access to the records relied upon by the State or, in the alternative, that the records pertaining to Mr. Hines be made part of the proceeding's record. The trial court denied this request and overruled Kandies's *Batson* challenge, noting that at the time that it peremptorily struck Mr. Hines, the State had (1) accepted another African American juror, who was then struck peremptorily by Kandies; (2) accepted a second African American juror, who was not peremptorily challenged by Kandies; and (3) accepted a third African American juror during the same proceeding that Mr. Hines was struck. Accordingly, the trial court found that Kandies failed to show that the State's proffered reason was pretextual.

Because I accord great deference to the trial court's determinations regarding purposeful discrimination, *Hernandez*, 500 U.S. at 365, I

cannot, on the record before me, conclude that Kandies's *Batson* challenge was improperly overruled by the trial court.

### 8. Mr. Wilson

In response to Kandies's *Batson* challenge, the State asserted that it struck Mr. Wilson because he "has a record of reckless driving, driving while impaired, four worthless checks, two [sic] injury to personal property, a simple assault, and assault by pointing a gun." J.A. 751. In response to the State's proffered race neutral reasons, Kandies's trial counsel renewed the motion made in response to the State's peremptory challenge to Mr. Hines, *i.e.*, requested access to the records relied upon by the State or that the records pertaining to Mr. Wilson be made part of the proceeding's record. The trial court denied this request on the same bases that it had previously done so and concluded, on the same grounds that it overruled Kandies's *Batson* challenge to the removal of Mr. Hines, that the State's proffered reasons were not pretextual. Accordingly, because the trial court's determination regarding purposeful discrimination is given great deference, *Hernandez*, 500 U.S. at 365, I conclude that the trial court did not err by overruling Kandies's *Batson* challenge to the peremptory removal of Mr. Wilson.

### 9. Ms. Oliver

During the selection of alternate jurors, the State exercised a peremptory challenge to remove Ms. Oliver. In response, Kandies's trial counsel raised a *Batson* challenge. After the court found that Kandies had made a showing of a *prima facie* discrimination case, the State asserted that it struck Ms. Oliver because she was "having trouble hearing . . . and because she certainly didn't listen to [the court's] instructions about watching t.v. or listening to any radio broadcasts about [the] case." J.A. 969. To rebut the State's assertion, Kandies's trial counsel noted that the State had accepted Caucasian American jurors who had also contravened the court's instructions about watching television or listening to radio broadcasts about the case.

While the disparate treatment of similarly situated prospective jurors of different races can be used to establish pretext, *Miller-El v. Cockrell*, 537 U.S. 322, 343-44 (2003), Kandies's trial counsel, in

challenging the removal of Ms. Oliver, did not point to jurors similarly situated to Ms. Oliver that the State accepted. Kandies's trial counsel only pointed to jurors accepted by the State that had contravened the court's instructions about watching television and listening to radio reports about the case whereas the State struck Ms. Oliver because she was (1) having trouble hearing and (2) failed to adhere to the court's instructions. Accordingly, I find that Kandies's disparate treatment argument fails and thus conclude that the trial court, whose determinations regarding purposeful discrimination merit great deference, *Hernandez*, 500 U.S. at 365, did not err by overruling Kandies's *Batson* challenge to the peremptory removal of Ms. Oliver.

## C.

In sum, while I have serious doubts regarding some of the "race neutral" reasons proffered by the State, I find that the state court did not unreasonably conclude that Kandies failed to make the requisite showing that the State's proffered reasons for peremptorily striking nine prospective African American jurors were pretextual.

## V.

We hold that the state court was not unreasonable in concluding that Kandies's trial counsel, despite not retaining a mitigation expert or specifically inquiring about childhood sexual abuse, thoroughly investigated Kandies's background for mitigating evidence and thus did not render ineffective assistance during the penalty phase. We also hold that the North Carolina Supreme Court's conclusion that the trial court properly overruled Kandies's *Batson* challenges to the State's peremptory removal of nine prospective African American jurors was neither contrary to nor an unreasonable application of clearly established federal law. Accordingly, the district court's denial of Kandies's habeas petition is

*AFFIRMED.*

MICHAEL, Circuit Judge, concurring in the judgment:

I concur in the judgment to affirm the district court's denial of Jeffrey C. Kandies's petition for a writ of habeas corpus. I write further

to explain why I vote to deny relief on Kandies's ineffective assistance of counsel claim. I agree with my two colleagues that it was not an unreasonable application of federal law for the state court to conclude that Kandies was not prejudiced by his counsel's failure to inquire into his history of childhood sexual abuse. This failure to inquire, however, compels the conclusion that counsel's performance was constitutionally deficient; I therefore disagree that the state court reasonably applied federal law in concluding otherwise.

I would hold that the state court unreasonably applied Sixth Amendment law because no member of Kandies's defense team bothered to ask him whether he had suffered sexual abuse as a child. Defense lawyers in a capital case have an "obligation to conduct a *thorough* investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)) (emphasis added). A background investigation can be limited "only to the extent that 'reasonable professional judgments support the *limitation*[ ].'" *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984)) (emphasis added). "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." *Strickland*, 466 U.S. at 691. Courts must measure "reasonableness under prevailing professional norms." *Id.* at 688. The American Bar Association's standards describing the duties of counsel are "guides to determining what is reasonable." *Id.* Here, the ABA's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases offer specific guidance for client interviews in death penalty cases. "As soon as is appropriate, counsel should," among other things, "[c]ollect information relevant to the sentencing phase of trial including, but not limited to: . . . family and social history (including physical, *sexual* or emotional abuse)." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(D)(2) (1989) (emphasis added). The state court and my colleagues overlook this crucial standard.

It was an unreasonable application of *Strickland* for the state court to conclude that the performance of Kandies's counsel was not consti-

tutionally deficient. Counsel in charge of the background investigation admitted that he "never investigated [childhood sexual abuse] as a possible mitigating factor." J.A. 1374. Counsel's utter failure to inquire into an area specifically mentioned in the ABA guidelines is a good indicator that his performance was constitutionally deficient. *See Strickland*, 466 U.S. at 688. Additionally, the nature of the charges against Kandies should have prompted counsel to inquire whether he had been sexually abused as a child. *See Wiggins*, 539 U.S. at 525 (holding the scope of investigation unreasonable in light of what available records revealed about the defendant's childhood). Kandies was accused of raping and murdering Natalie Osborne, his son's four-year-old half-sister, circumstances that the prosecution obviously would (and did) use to press for the death penalty at sentencing. Because statistical evidence shows that men who sexually abuse children were often victims of sexual abuse themselves, counsel should have been particularly vigilant in searching for evidence that Kandies had been sexually abused as a child.

The state court did not find — and there is no evidence to support such a finding — that Kandies's counsel made a "reasonable professional judgment[ ]" when he failed to ask anyone whether Kandies had ever been sexually abused. *See Strickland*, 466 U.S. at 691. The only explanation counsel provided for this failure was that during his open-ended investigatory interviews "the subject of child[hood] sexual abuse which Mr. Kandies may have suffered was never raised" by anyone. J.A. 1374. Thus, counsel, like my colleagues, *ante* at 16-17 and *post* at 46-47, and the state court, J.A. 1381-82, attempts to blame those being interviewed for not *volunteering* that Kandies had been sexually abused. However, the ABA guidelines and common sense dictate that it is counsel's responsibility to inquire into specific areas that might prove useful in mitigation. Counsel cannot expect the accused or his family and friends to know what sorts of facts in the accused's background might be relevant to sentencing. Moreover, it is unrealistic to assume that facts going to mitigation — facts that are often painful to discuss because they may involve abuse or emotional trauma — will be freely volunteered in open-ended interviews. While open-ended interviews and questions have their place, no lawyer could expect to uncover all potentially useful information unless he explores important mitigation terrain with specificity. The failure of Kandies's counsel to conduct any sort of inquiry into possible child-

hood sexual abuse amounted to constitutionally deficient perfor-
mance, and the state court's conclusion to the contrary is objectively
unreasonable.

My two colleagues conclude that Kandies's counsel made a con-
certed effort to undertake a thorough investigation of Kandies's back-
ground for any mitigating evidence and that Kandies thus cannot
establish that his counsel's performance was objectively unreason-
able. *Ante* at 17-18; *post* at 46-47. In support of their separate conclu-
sions, my colleagues note that Kandies's counsel conducted numerous
interviews with the defendant, his friends, members of his family, and
mental health professionals. *Ante* at 16; *post* at 40. My colleagues fur-
ther observe that Kandies's counsel presented thirty-three mitigating
factors to the jury and that the jury accepted twenty-one of those fac-
tors. *Ante* at 17; *post* at 50. Likewise, the state court reviewed the mit-
igating evidence presented by counsel and concluded that
"considering all [the] circumstances . . . trial counsel's performance
was not objectively unreasonable." J.A. 1383.

My colleagues and the state court focus on the wrong issue. The
question is not whether counsel made an overall concerted effort to
investigate Kandies's background. Rather, the question is whether "a
*particular* decision not to investigate" is "reasonable[ ] in all the cir-
cumstances." *Strickland*, 466 U.S. at 691 (emphasis added). While
counsel seems to have conducted a meaningful investigation into cer-
tain aspects of Kandies's background, there is nothing to suggest that
counsel's decision to conduct *no* investigation into an entire area of
potentially mitigating evidence was "reasonable[ ] in all the circum-
stances." *Id.* Indeed, counsel admits in his affidavit that he "*would
have pursued*" Kandies's history of sexual abuse as a possible miti-
gating factor if he had known about it. J.A. 1374 (emphasis added).
Counsel did not know about it for one reason: his investigation of
Kandies's background was unreasonably limited. The fact that Kan-
dies's counsel hired a substance abuse expert and forensic psycholo-
gist to evaluate Kandies does not alter my conclusion that counsel's
performance was constitutionally deficient because *neither* expert
asked Kandies if he had been sexually abused as a child. J.A. 1371,
1383. The Supreme Court reached the same conclusion in *Wiggins*,
reasoning that "counsel's decision to hire a psychologist" and that
psychologist's "clinical interviews with [the defendant], as well as

meetings with [the defendant's] family members," "sheds no light on the extent of [counsel's] investigation" because there was no indication that the psychologist investigated other areas (such as social history) of the defendant's background. 539 U.S. at 532.

My colleagues transform *Strickland*'s objective inquiry (with due deference to counsel's justifications for his actions) into a rule that counsel's investigation of mitigating factors can never be constitutionally deficient if he puts on some mitigation evidence and a court can come up with a theoretical justification to excuse a blunder. Because this approach contravenes *Strickland*, I would hold only that the state court's conclusion that Kandies was not prejudiced by his counsel's performance was not an unreasonable application of federal law.

TRAXLER, Circuit Judge, concurring:

Jeffrey Clayton Kandies was found guilty by a jury of the first-degree murder and rape of four-year-old Natalie Lynn Osborne. In accordance with the jury's unanimous recommendation, Kandies was sentenced to death. His direct appeals were unsuccessful as was his bid for collateral relief in North Carolina state court. Kandies subsequently filed this federal action for habeas relief under 28 U.S.C.A. § 2254 (West 1994 & Supp. 2004). The district court denied his application for relief, and Kandies appeals that denial to this court. For the reasons set forth below, I would also affirm the district court's denial of habeas relief, and thus I concur in the result reached by Judge Gregory's opinion. I write separately, however, because my application of § 2254 to the state court's disposition of Kandies' claims differs substantially from that of my colleague Judge Gregory.

## I.

The pertinent facts are recounted thoroughly in the opinion from the North Carolina Supreme Court issued on direct review:

> Patricia Craven lived in Asheboro with her four-year-old daughter, Natalie, and her sons, Zachary and Jeremy, ages six and one, respectively. [Kandies] was Craven's fiancé

and Jeremy's father. Although [Kandies] had a separate residence approximately ten miles away in Randleman, he often stayed with Craven at her apartment in Asheboro.

On Easter Monday, 20 April 1992, [Kandies] and Craven disciplined Natalie for eating Zachary's Easter candy by requiring her to stay in her room for the remainder of the day. Craven saw Natalie periodically throughout the day, but last saw her alive between 4:00 and 4:30 p.m. Around 4:45 p.m., [Kandies] left the apartment to go to the grocery store. He did not return until 7:30 that evening. He attributed his tardiness to helping an elderly couple who had mechanical problems with their Winnebago. Once home, [Kandies] began fixing a pizza for the children. When it was ready, he told Zachary to call for Natalie. When Zachary did not find Natalie in her bedroom, [Kandies] and Craven began looking for her. One neighbor told Craven that he had noticed Natalie outside playing sometime that afternoon, but no one recalled seeing her since that time. After a while, [Kandies] called the Asheboro Police Department to report Natalie missing. An extensive search for her was conducted that night, but without success.

Earlier that evening, around 7:00 p.m., [Kandies] entered . . . a small convenience store located about one-half mile from the Craven residence. Carolyn Wood, the clerk, testified that at that time, [Kandies] was complaining about his hand hurting. He told Wood that he had gotten into a fight with his brother. Wood noticed that the hand was beginning to swell and suggested that [Kandies] let a medical technician who happened to be in the store look at his hand to see if it was broken. [Kandies] declined and immediately left the store.

Later that evening, close to midnight, [Kandies] returned to the store to ask if Wood had seen Natalie . . . and told her to call the police if she saw the little girl. At the time, Wood observed black garbage bags in the back of [Kandies'] truck.

On Tuesday, 21 April 1992, [Kandies] agreed to accompany officers to his residence in Randleman to look for Nat-

alie. The police surmised that perhaps Craven and [Kandies] had hidden Natalie at the Randleman residence because Craven had been in a custody dispute over Natalie with her former husband, Ed Osborne. The police looked through the house but did not find Natalie.

On Wednesday, 22 April, Craven and [Kandies] went to the Asheboro Police Department for questioning. . . . Upon [Kandies'] return to the apartment [having been interrogated much longer than Craven], Craven asked him if he knew anything about . . . Natalie. [Kandies] responded by telling Craven that he had hit Natalie with his truck when he was leaving to go to the grocery store . . . . [Kandies] said he panicked because he had been drinking. He picked Natalie up and took her to the house in Randleman to clean her off and see how badly she was hurt. During the drive to Randleman, [Kandies] said that Natalie was making gurgling noises and that her head did not look right. After trying to clean her up, [Kandies] concealed Natalie and her clothes in a garbage bag and put the bag in a bedroom closet. [Kandies] then got in his truck and took his time returning to Asheboro.

Craven called the police immediately . . . . [Kandies] gave details as to the location of Natalie's body and signed consent to search forms for the Randleman house.

The police searched the Randleman residence and found Natalie's body in a plastic bag, buried under a pile of clothes and carpet pieces in a bedroom closet. A bloody playsuit and a bloody pair of panties, both turned inside out, were also found in the bag. . . .

Dr. Thomas Clark, a forensic pathologist, performed an autopsy . . . [and] found two lacerations to the top of the head which he characterized as blunt-force injuries. He also found lacerations on the right side of the head and abrasions on the left side of the head and on the front of the neck; there was evidence the skull had been fractured. There were multiple bruises on the back and both sides; the bruises were

small and rounded and had a distribution and shape suggestive of an adult hand. Clark also found injuries to the pelvic region. There were bruises on both sides of the vagina, which was full of blood. The opening of the vagina was patulous, and there was a laceration a half-inch wide and an inch long on the back wall of the vagina. Clark opined that these injuries were indicative of sexual assault and that they had occurred at or about the time of death.

. . . . [Kandies] denied [in a statement to police] doing anything sexual to Natalie. He remembered taking Natalie to his house, putting her in the bathtub, and taking off her clothes to see how badly she was hurt. At that time Natalie was bleeding extensively but appeared to be alive and moving. [Kandies] stated that he could not handle the situation and may have strangled Natalie.

*State v. Kandies*, 467 S.E.2d 67, 73-74 (N.C. 1996). The jury found Kandies guilty of first-degree murder on two bases: (1) felony murder and (2) premeditation and deliberation. The jury also found Kandies guilty of first-degree rape.

Following the sentencing proceedings, the jury found two aggravating circumstances: (1) that Kandies committed the murder during the commission of first degree rape, and (2) that the murder was especially heinous, atrocious, or cruel. Kandies offered five statutory mitigating factors, of which the jury found three. Additionally, the jury found eighteen of twenty-eight nonstatutory mitigating factors. The jury unanimously recommended that Kandies be sentenced to death, and the trial court sentenced Kandies accordingly.

On direct appeal to the North Carolina Supreme Court, Kandies raised several issues, including the claim that the prosecution used its peremptory challenges to strike prospective jurors on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny. The North Carolina Supreme Court rejected Kandies' *Batson* claim, holding that "the State's dismissal of each of these jurors was based on race-neutral reasons which were clearly supported by their individual responses during *voir dire*." *Kandies*, 467 S.E.2d at 76. The United States Supreme Court denied Kandies' petition for a writ of

certiorari on the *Batson* claim as well as all other claims raised on direct appeal. *See Kandies v. North Carolina*, 519 U.S. 894 (1996).

Kandies next filed a motion for appropriate relief ("MAR") in North Carolina Superior Court, alleging, *inter alia*, that counsel was ineffective for failing to discover that he was sexually abused at an early age. The state MAR court denied relief on this claim. On remand for reconsideration by the Supreme Court of North Carolina, the state MAR court affirmed its earlier order, and the supreme court subsequently denied Kandies' petition for a writ of certiorari. *See State v. Kandies*, 539 S.E.2d 640 (N.C. 1999).

Finally, Kandies applied for habeas relief in district court pursuant to 28 U.S.C.A. § 2254. He raised numerous claims, each of which was denied by the district court. *See Kandies v. Lee*, 252 F. Supp. 2d 252 (M.D.N.C. 2003). We issued a certificate of appealability under 28 U.S.C.A. § 2253 (West Supp. 2004) for only two of these claims: (1) that the prosecution violated *Batson* by peremptorily striking prospective jurors based on race and that the North Carolina Supreme Court on direct review unreasonably rejected the *Batson* claim; and (2) that the MAR court unreasonably rejected Kandies' ineffective assistance of counsel claim, which was based on the attorneys' failure to discover Kandies' background of sexual abuse for use as a mitigator during the sentencing phase.

For the reasons suggested in my analysis below, I concur with Judge Gregory that Kandies is not entitled to habeas relief, although I would apply the standard of review prescribed by Congress in § 2254 differently.

## II.

Because Kandies' federal claims have been adjudicated on the merits by the North Carolina state court, we are constrained in our review by the standards set forth in § 2254(d). Under this provision, a federal habeas court is precluded from granting habeas relief unless it concludes that the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts," *Williams*, 529 U.S. at 413. A state court decision "involve[s] an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), if the state court decision "identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case," *Williams*, 529 U.S. at 413. An objectively "*unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Id.* at 412. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

### III.

I begin with Kandies' claim that his defense counsel was constitutionally ineffective for inadequately investigating his background and discovering that he had been sexually molested as a child, and for failing to present such evidence as mitigating during the penalty phase of his trial.

### A.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence," U.S. Const. amend. VI, and that such assistance be effective, *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to establish an ineffective assistance of counsel claim, Kandies was required to establish (1) that his "counsel's representation fell below an objective standard of reasonableness," measured by the

"prevailing professional norms," *id.* at 688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

### B.

During his trial, Kandies was represented by two court-appointed attorneys, Mr. Clark Bell, who was appointed as lead counsel, and Mr. Scott Dunn, who was appointed to assist Mr. Bell as second-chair counsel. In his MAR before the state court, Kandies asserted that he received ineffective assistance of counsel because (1) Mr. Dunn did not meet the minimum qualifications required by the rules for appointment of counsel for indigent defendants; and (2) Mr. Dunn's mitigation investigation was inadequate because he failed to discover that Kandies had been sexually molested as a young child. In support of his ineffectiveness claim, Kandies submitted affidavits completed by Mr. Dunn, his mother, and himself.

According to Kandies' affidavit, he was the victim of sexual molestation by his uncle, Ronald Kandies, when he was six years old. Kandies stated that:

> [t]hese incidents of sexual abuse took place when I was living in New York State. My uncle, who was an adult 15-20 years older than me, would touch my private parts with his hand. He would also make me touch his private parts. He would also take showers with me and fondle me while in the shower. My uncle would buy me toys such as GI Joes in order to get me not to tell anybody about what he was doing to me. These traumatic experiences haunted me throughout my adult life.

J.A. 1371. Kandies' mother had no knowledge of Kandies' sexual molestation by his uncle. Upon learning of Kandies' claim, she could state only that she had been "somewhat curious as to why [Kandies' uncle] always wanted to baby-sit for [her] son" and why he "was always buying gifts for [Kandies]" when he was six years old. J.A.

1375. She also noted that Kandies wet the bed until he was ten or eleven years old and was reluctant to let her assist him with dressing and undressing.

Mr. Dunn also submitted an affidavit. According to Mr. Dunn, he "served as court-appointed second chair counsel" to Mr. Bell, and his "primary responsibility was preparation of the mitigation phase of the trial." J.A. 1373-74. Mr. Dunn, during the course of his preparations,

> had numerous interviews with Mr. Kandies, members of his family, friends and mental health professionals regarding possible items in Mr. Kandies' background that could be presented as mitigating factors. During the course of these discussions[,] the subject of child sexual abuse which Mr. Kandies may have suffered was never raised, and [he] never investigated this area as a possible mitigating factor.

J.A. 1374. For his part, Kandies confirms that "[d]uring the course of preparing for trial," he "met with Mr. Dunn and Mr. Bell on various occasions," but avers that "[a]t no time during the investigation and trial preparation stage of [his] case was [he] ever questioned by [his] attorneys or anybody acting on their behalf if [he] had been the victim of childhood sexual abuse or any other crime." Kandies states that "[h]ad [he] been asked [he] would have told of [his] molestation by [his] uncle . . . when [he] was six years old." J.A. 1371.

The state MAR court rejected Kandies' claim that his legal representation was deficient based upon his claim that Mr. Dunn did not meet the minimum qualifications required by the rules for appointment of counsel for indigent defendants. The court noted that Kandies was represented by two competent trial counsel (Mr. Bell and Mr. Dunn) and that Mr. Dunn's limited experience did not result in a performance that fell below the applicable standards. Additionally, the court noted that, even if it were to assume that Mr. Dunn's appointment was contrary to the state bar rules concerning appointment of counsel in capital cases, Kandies failed to demonstrate that he was prejudiced in his defense as a result.

The MAR court also rejected Kandies' claim that his trial attorneys' performance was objectively unreasonable because they failed

to discover evidence of sexual molestation. The court noted that the subject of child sexual abuse now claimed by Kandies was never raised by Kandies or any of the other numerous witnesses interviewed by his attorneys in preparation for the mitigation case, and that the trial attorneys were diligent and thorough in the presentation of the mitigation case, as evidenced by the number and nature of the defense witnesses they were able to bring to trial.[1] The state court also concluded that trial counsels' failure to specifically ask Kandies whether he had been the victim of childhood sexual abuse, in the absence of any indication or suspicion that he had been, "was not *per se* ineffective assistance of counsel, and, considering all circumstances, that trial counsel's performance was not objectively unreasonable." J.A. 1383. Additionally, the court concluded that Kandies failed to "demonstrate the existence of a reasonable probability that the outcome of the sentencing phase of the trial would have been different had trial counsel" discovered and presented his claims of childhood sexual abuse. J.A. 1383.

## C.

I begin with the state court's determination that Kandies failed to demonstrate that his "counsel's representation fell below an objective standard of reasonableness," as measured by the "prevailing professional norms." *Strickland*, 466 U.S. at 688.

In preparation for the mitigation phase of the case, Kandies' attorneys conducted numerous interviews with Kandies, members of Kandies' family, and several of Kandies' childhood and current friends in order to prepare a family and social history. In addition, the attorneys enlisted the support of two mental health professionals regarding possible items in Kandies' background that could be presented as mitigat-

---

[1]As noted by the state MAR court, trial counsel presented the testimony of Kandies' mother, three of Kandies' friends from South Carolina, Kandies' former landlady in Maine, a former driving instructor and coworker of Kandies, the clerk from a beer store near Kandies' place of employment where he frequently bought significant quantities of beer, an expert in substance abuse who spent numerous hours interviewing Kandies, and a forensic psychologist who spent numerous hours interviewing and testing Kandies.

ing factors. As a result of these efforts, Kandies' attorneys presented the testimony of eight lay witnesses and two expert witnesses during the sentencing phase, developing a strategy of mitigation that included, among other things, evidence of Kandies' difficult childhood and the early onset and progressively pathological nature of Kandies' substance abuse and dependence.

During this presentation, Kandies' mother testified that her husband was physically violent towards her and drank alcohol excessively, and that Kandies, even at a young age, would attempt to protect her and his sister from the man he then believed was his father. Ms. Kandies testified that, when Kandies was approximately 14 years old, she and her husband planned to separate and Kandies learned for the first time that her husband was not his biological father and that his biological father was deceased. According to Ms. Kandies, this upset Kandies significantly and for a long time. According to Ms. Kandies, Kandies got drunk in high school and had to complete a 6-week alcohol and drug abuse program, and Kandies eventually dropped out of school his senior year. Kandies' friends and other acquaintances confirmed this history of substance abuse.

Dr. Brian Glover, a clinical psychologist with a specialty in addictive disorders and a clinical faculty member with the Department of Psychiatry at the University of North Carolina in Chapel Hill, also appeared for the defense. Dr. Glover testified that he personally interviewed Kandies on three separate occasions prior to trial, for a total of approximately six hours, and interviewed three of Kandies' acquaintances to collaborate the information obtained from Kandies regarding his social history and substance abuse. At trial, Dr. Glover presented extensive testimony regarding Kandies' history of substance abuse, which began when he was 12 years old and escalated during his adolescent years. Dr. Glover testified that, in his opinion, Kandies had a long-standing, severe dependence on alcohol, constituting a mental or emotional disturbance. Dr. Glover testified that, based upon Kandies' statement that he had drunk approximately twelve beers on the day of Natalie's rape and murder, and the effect of that quantity upon his ability to make good decisions or judgments and control his emotions, it was his opinion that Kandies' ability to appreciate the criminality of his actions was impaired on the evening that Natalie was raped and killed.

Dr. Claudia Coleman, a forensic psychologist who assisted the defense in the preparation of the mitigation case, also conducted extensive interviews, including asking questions pertaining to Kandies' social, educational, and family history. She interviewed Kandies in September 1993 and in November 1993 for approximately three hours each time, and conducted psychological testing, intellectual testing, and neuropsychological screening for neurological impairment. Dr. Coleman reviewed the police investigative reports, Kandies' school, military, and work records, and witness statements. She also consulted with Dr. Glover. She presented testimony that Kandies had discussed with her various problems he had experienced with fighting when enlisted in the army and his ultimate discharge from the armed services, but no testimony indicating that Kandies discussed any history of sexual molestation with her. It was the opinion of Dr. Coleman that Kandies suffered from two primary clinical disorders: alcohol dependence and a personality disorder exhibiting traits of passive-aggressiveness, impulsivity, and immaturity. She classified Kandies as having emotional or mental disturbances and also testified that, in her opinion, his judgment and ability to think clearly were impaired on the evening of Natalie's rape and murder.

Kandies declined to exercise his right to testify during the mitigation phase of his trial, choosing instead to only make the following statement in allocution:

> I just want to apologize to everybody that had a part of Natalie's life, and that's her mother Pat, her father Ed, and her grandparents, and I just want to tell you how deeply sorry I am for what I have done, the grief that I have put you all through. I can't change nothing, and I really wish I could. I just hope that you all can find it in your hearts to forgive me for what I have done. That's all.

J.A. 1206.

On habeas review, Kandies takes little issue with the general thoroughness of the mitigation investigation conducted by his attorneys. And there appears to be no dispute that none of the mitigation witnesses, nor Kandies himself, ever mentioned anything about the sexual molestation allegedly inflicted upon Kandies as a child by his

uncle. Rather, Kandies' specific claims of ineffectiveness are quite narrow. He asserts that his attorneys' performance fell below the prevailing professional norms, and that the state court unreasonably concluded to the contrary, because (1) Mr. Dunn lacked the necessary experience and failed to seek a mitigation investigator in contravention of the ABA Guidelines for capital litigation, and (2) Mr. Dunn unreasonably failed to *specifically* ask Kandies whether he had been sexually molested as a child in order to elicit that withheld information.

1.

I need not tarry long with Kandies' first claim, *i.e.*, that the representation he received was constitutionally ineffective, and that the state MAR court unreasonably concluded to the contrary, because his second-chair defense attorney lacked the necessary qualifications and experience to try a death penalty case and, as a result, also failed to seek a mitigation investigator as recommended by the ABA guidelines governing death penalty cases. *Cf. Wiggins v. Smith*, 123 S. Ct. 2527, 2536-37 (2003) (noting that "the standards for capital defense work articulated by the American Bar Association (ABA)" have long been referred to "as 'guides to determining what is reasonable'" (quoting *Strickland*, 466 U.S. at 688)).

In order to establish an ineffective assistance of counsel claim, Kandies was required to demonstrate that the actual *representation* he received from his attorneys "fell below an objective standard of reasonableness," as measured by the "prevailing professional norms." *Strickland*, 466 U.S. at 688. As noted by the state court, Kandies was represented by two licensed and competent court-appointed trial attorneys. The limited experience of Mr. Dunn alone demonstrates nothing about the competency of the representation that Kandies received from his attorneys. Thus, Kandies clearly failed to demonstrate that Mr. Dunn's limited experience in capital murder trials resulted in a performance that fell below the applicable standards or that it resulted in any prejudice to him, and the state court did not unreasonably conclude to the contrary.

Kandies' claim that his attorneys unreasonably failed to enlist the assistance of a "mitigation investigator" is also unavailing. According

to Kandies, the ABA guidelines required the attorneys to enlist the assistance of investigators and other assistants" and of "experts where it is necessary or appropriate" for the preparation of the defense. As noted by the state court, and as discussed in more detail below, Kandies' attorneys enlisted the aid and testimony of law enforcement officers and two mental health professionals during the mitigation phase of the case including, most notably, a forensic psychologist with extensive experience in capital and other criminal trials.[2]

2.

Thus, I turn to the heart of Kandies' claim, *i.e.*, that the state court unreasonably concluded that his defense counsel was not constitutionally ineffective for failing to specifically ask him whether he had been sexually molested as a child. In a nutshell, Kandies asserts that in any capital case involving child molestation, an attorney must be deemed ineffective if he or she does not specifically ask whether the defendant has a history of sexual molestation as a child. This is so, Kandies asserts, because of the "well-known" fact that child sex offenders are often sexually molested as children.

In death penalty cases, defense attorneys are required to undertake *reasonable* investigations into possible mitigating evidence that could be presented during the penalty phase. *See Wiggins*, 123 S. Ct. at 2535-36; *Strickland*, 466 U.S. at 691. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a

---

[2]The record is unclear as to whether Kandies raised this "mitigation investigator" claim before the state MAR court or, for that matter, whether he raised the ABA guidelines in support of his ineffectiveness claim at all before that court. The state court opinion appears to indicate that Kandies took issue with Mr. Dunn's experience under the state rules governing the appointment of counsel for indigent defendants. However, the state does not assert that these more specific claims are procedurally barred. In any event, I have no trouble concluding *de novo* that Kandies failed to demonstrate that his counsel was ineffective based upon his level of experience or his failure to retain a mitigation investigator or that the state court's adjudication of the "experience" claim was not an unreasonable one.

particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland*, 466 U.S. at 691. "[T]here is a presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" *Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003) (quoting *Strickland*, 466 U.S. at 689). "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins*, 123 S. Ct. at 2541.

Having reviewed the evidence presented at sentencing and that offered in support of the state MAR claim, I cannot say that the North Carolina court's adjudication of this claim was contrary to or an unreasonable application of these governing Supreme Court precedents. This is not a case in which trial counsel failed to conduct any inquiry, or conducted only a cursory inquiry, into the accused's family background and social history. *See Williams*, 529 U.S. at 396 (concluding that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background"); *Wiggins*, 123 S. Ct. at 2536 (noting that, "in deciding whether [counsel] exercised reasonable professional judgment," we must "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was itself reasonable" (internal quotation marks and emphasis omitted)). Rather, the evidence indicates that Kandies' counsel thoroughly and competently investigated Kandies' social history, and enlisted the assistance of experts to do the same, in order to uncover, among other things, any childhood or adolescent history that might have mitigating value. Indeed, through this process, it was discovered that Kandies had been exposed to a dysfunctional childhood environment which included an alcoholic stepfather, his stepfather's verbal abuse and physical abuse towards his mother, Kandies' attempts to protect his mother and sister from his stepfather, and Kandies' discovery during his adolescent years that this man was his stepfather and not, as he had been led to believe, his father. Yet at no time did Kandies' mother, Kandies, nor any of the other witnesses advise defense counsel or the experts

retained to assist them in the preparation of mitigating evidence that Kandies had been the victim or was suspected of having been the victim of any sexual abuse or, for that matter, any physical abuse himself. *Cf. Barnes v. Thompson*, 58 F.3d 971, 979-80 (4th Cir. 1995) (holding that defense counsel "may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation").[3]

In sum, the North Carolina court held that defense counsels' otherwise thorough investigation and presentation of mitigating evidence was not rendered objectively unreasonable simply because counsel did not *specifically* ask Kandies if he had been sexually molested as a child. I concur in the denial of federal habeas relief because I cannot say that this adjudication was contrary to or involved an unreasonable interpretation of the applicable Supreme Court precedents. *Cf. Wiggins*, 123 S. Ct. at 2535 ("We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" (quoting *Strickland*, 466 U.S. at 688)); *Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.").

---

[3]As noted by the state MAR court:

> Neither of the two experts in psychology who interviewed and evaluated defendant mentioned in their testimony anything indicating that defendant had told them that he had been the victim of sexual abuse as a child. Furthermore, neither defendant's mother nor any of the other witnesses who testified on defendant's behalf said anything about defendant being the victim of sexual abuse as a child. On the one occasion when defendant personally addressed the jury, he did not state anything about being sexually abused as a child.

J.A. 1379.

D.

I would also deny habeas relief because, in my view, the North Carolina state court reasonably concluded that Kandies failed to establish that he was prejudiced by the failure to present the evidence of his alleged sexual molestation to the jury.

Although concluding that Kandies' trial counsel were not ineffective in their investigation and presentation of the mitigation case, the state MAR court went on to reach this second prong of the *Strickland* analysis and concluded that, even if the attorneys' failure to discover the sexual abuse could be considered deficient performance, the "evidence of record affirmatively demonstrates that the failure to produce evidence of childhood sexual abuse did not produce the prejudice that is a requirement of reversal." J.A. 1383. Specifically, the court determined that the "failure to discover and present evidence of defendant's childhood sexual abuse does not demonstrate the existence of a reasonable probability that the outcome of the sentencing phase of the trial would have been different had trial counsel presented such evidence." J.A. 1383.

In order to establish a Sixth Amendment ineffective assistance of counsel claim, Kandies was required to demonstrate that counsel's alleged deficient performance prejudiced his defense. In order to demonstrate prejudice, Kandies was required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 123 S. Ct. at 2542. In the death penalty context, to assess prejudice, the court must "reweigh the evidence in aggravation against the totality of the available mitigating evidence." *Wiggins*, 123 S. Ct. at 2542. Prejudice requires "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 123 S. Ct. at 2543.

Few would dispute that the aggravating evidence in this case was compelling. The jury was presented with evidence that Kandies brutally raped and murdered a four-year-old child. Blood was found on the bathroom floor and tub, the bedroom floor, the laundry room floor, the kitchen floor, and the floor between the bedroom, bathroom,

and den at Kandies' home. As noted by the North Carolina Supreme Court,

> the State's evidence tended to show that Natalie was savagely beaten, strangled, and sexually assaulted by a man whom she knew and trusted. When discovered, she was in a trash bag buried in the recesses of a closet, bloodied and naked, with her soiled [panties and playsuit] piled on top of her. An autopsy showed that Natalie had suffered two blunt-force lacerations to the top of her head. The right side of her head was fractured, and there were seven separate bone fragments in the area, one of which had penetrated the brain and caused a hemorrhage. There were multiple bruises on her face, back, neck, sides, and chest. An abrasion on the front of the neck measuring one-inch wide and approximately two and one-half inches long indicated manual strangulation. There was some discoloration around the rectum, bruises on both sides of the vagina, and blood deep within the vaginal canal.

> The pathologist opined that Natalie died as a result of blunt-force injury to the head. While she probably lost consciousness soon after the painful blows, none of the injuries would have caused her heart to stop beating immediately. Therefore, it was several excruciating moments before she actually died.

> This evidence, viewed in the light most favorable to the State, was sufficient to support a reasonable inference that Natalie suffered great physical pain as a result of being brutally beaten, raped with sufficient violence to cause bleeding in her vagina, and strangled so forcefully that her neck was scratched. It also supports an inference that the murder was dehumanizing and psychologically torturous. The pathologist testified that Natalie's pelvic injuries occurred at or near the time of death. When a murder occurs during the perpetration of a violent sexual assault, it is unusually dehumanizing and debasing. Further, defendant abused the trust of a four-year-old girl and violated her in multiple ways. A reasonable jury could infer that Natalie experienced terror, con-

fusion, and anguish from the moment the defendant drove off with her in the truck until her last breath.

*Kandies*, 467 S.E.2d at 84-85 (citations omitted). At the conclusion of the capital sentencing phase, the jury found, based solely upon the evidence presented during the guilt phase, that Natalie was murdered while Kandies was engaged in the commission of first-degree rape and that the murder was especially heinous, atrocious, or cruel.

As a result of the thorough efforts of defense counsel, however, the jurors found three of five proposed statutory mitigating circumstances and eighteen of twenty-eight nonstatutory mitigating circumstances. Specifically, members of the jury found (1) that the defendant had no significant history of prior criminal activity; (2) that the murder was committed while the defendant was under the influence of mental or emotional disturbance; (3) that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired; (4) that the defendant cried and expressed remorse when talking to Natalie's mother on April 23, 1992; (5) that the defendant cried and expressed remorse when talking to Officer Wilson on April 23, 1992; (6) that the defendant called the Asheboro Police Department to speak to Officer Wilson regarding Natalie's location prior to his arrest; (7) that the defendant called the Asheboro Police Department to talk to Officer Wilson to acknowledge his responsibility for Natalie's death prior to his arrest; (8) that the defendant voluntarily waived his right to remain silent and to speak to an attorney or to have an attorney present; (9) that the defendant made voluntary acknowledgments of his responsibility for Natalie's death to Officer Wilson and Officer McIver on April 23, 1992; (10) that the defendant was a chronic, long-term substance abuser; (11) that the defendant suffered from acute substance abuse; (12) that the defendant had a troubled childhood; (13) that the commission of the crime was out of character for the defendant; (14) that the defendant was led to believe that his stepfather was his biological father until he was twelve years old and was told at that time that his real father was dead; (15) that the defendant never had a positive role model; (16) that the defendant suffered from a personality disorder; (17) that the defendant came from a dysfunctional family; (18) that the defendant as a child observed verbal and physical abuse of his mother by his stepfather; (19) that the defendant was the child of an

alcoholic step-parent; (20) that the defendant suffered from a history of depression; and (21) that the defendant was reared in an unstable environment.

In short, Kandies' sentencing jurors heard and found a number of significant mitigating factors, yet still unanimously found that the mitigating circumstances did not outweigh the aggravating circumstances and recommended a sentence of death. The North Carolina MAR court determined that there was no reasonable probability that the jury would have returned a different sentence recommendation had it been confronted with Kandies' testimony that he was sexually molested at the age of six in the fashion described in his affidavit. In light of the totality of the evidence presented at trial and in the state habeas proceeding, I cannot say that this was an unreasonable decision on its part.

## IV.

The next issue is whether the North Carolina Supreme Court's rejection of Kandies' *Batson* claims "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(1) and (2). The prosecution peremptorily struck several prospective African-American jurors; Kandies contends that the State excluded these jurors based on their race, which is constitutionally impermissible under *Batson*, which teaches that the Equal Protection Clause prohibits the use of peremptory strikes against a prospective juror on the basis of race. 476 U.S. at 85-86. The Supreme Court has prescribed a three-step analytical process for evaluating a *Batson* claim. First, the opponent of the peremptory strike "must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Hernandez v. New York*, 500 U.S. 352, 358 (1991) (plurality). Second, if a *prima facie* showing has been made, "the proponent of the strike [must] come forward with a race-neutral explanation." *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam). As long as the explanation is not inherently discriminatory on its face, "the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360.

Third, if the proponent of the strike has proffered a race-neutral explanation, "the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett*, 514 U.S. at 767. Thus, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* at 768. The third step presents the trial court with a "pure issue of fact." *Hernandez*, 500 U.S. at 364. Even on direct review, the trial court's findings with respect to discriminatory intent are reviewed with significant deference because such findings "largely will turn on evaluation of credibility" and an appellate court "is not as well positioned as the trial court is to make credibility determinations." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (internal quotation marks omitted). This approach holds true all the more so on habeas review, where we apply the extremely deferential standard prescribed by statute. *See* 28 U.S.C.A. § 2254(d). As noted above, a state court's conclusion with respect to whether there was discriminatory intent in the prosecution's exercise of peremptories is a factual determination. In turn, in federal habeas proceedings, factual determinations by the state court "shall be presumed to be correct," and the "[habeas] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1); *see Miller-El*, 537 U.S. at 340.

Pursuant to North Carolina law, the State must begin the voir dire process by individually questioning twelve randomly selected members of the prospective juror panel. *See* N.C. Gen. Stat. § 15A-1214(d). If a prospective juror is excused for cause or removed because the State exercises a peremptory strike, the clerk immediately draws a replacement. This continues until "the prosecutor is satisfied with the 12 in the box," at which point the prospective jurors are "tendered to the defendant." *Id.* However, "[u]ntil the prosecutor indicates his satisfaction, he may make a challenge for cause or exercise a peremptory challenge to strike any juror, whether an original or replacement juror." *Id.*

In a North Carolina capital case, both the State and the defendant are allotted 14 peremptory challenges during jury selection. *See* N.C. Gen. Stat. § 15A-1217(a). Additionally, "[e]ach party is entitled to one peremptory challenge for each alternate juror in addition to any unused challenges." N.C. Gen. Stat. § 15A-1217(c). In selecting the

jurors who decided Kandies' case, the prosecutor used twelve of his fourteen allotted peremptory strikes. Eight of the twelve prospective jurors peremptorily struck by the prosecutor were African-American. The final racial composition of the jury included two African-Americans. The prosecutor accepted a third African-American juror, but Kandies used one of his own peremptory challenges to excuse that juror. Following the selection of twelve jurors, the parties also selected three alternate jurors. Six potential alternate jurors underwent voir dire examination by the parties. The prosecution peremptorily struck three prospective alternate jurors, one of whom was African-American.

In every instance that the State exercised a peremptory challenge against an African-American juror, Kandies raised a *Batson* objection. And, in each case, the prosecution came forward with race-neutral reasons for exercising the peremptory challenge in question, even though the trial court never explicitly determined whether Kandies had established a *prima facie* case of discrimination during his series of *Batson* motions. In essence, the trial court's analysis proceeded from the second *Batson* step. On direct review, the North Carolina Supreme Court noted that, in such a case, it is appropriate for the trial court to proceed "as if a prima facie case had been established" for every vernireperson at issue. *Kandies*, 467 S.E.2d at 75. On habeas review, we have taken the same approach. *See Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997) ("Because the prosecutor offered a race-neutral explanation in response to Matthews' objection, the preliminary issue of whether Matthews established a *prima facie* case of discrimination is moot.").

Kandies' specific arguments in support of his *Batson* claim can be divided loosely into two groups. First, he contends that the court's conclusion that there was no purposeful discrimination in the State's use of its peremptory strikes was unreasonable in light of the fact that the State's reasons for peremptorily striking the nine prospective African-American jurors were equally applicable to several prospective Caucasian jurors who were accepted by the State. Second, Kandies argues that the state court ignored other evidence of discriminatory intent, including the statistical disparity between the number of African-American jurors struck from the panel and the number of Caucasian jurors struck and the prosecutor's alleged per-

sonal history of systematically using peremptory strikes to exclude African-American jurors.

### A.   Disparate Treatment of Similarly Situated Caucasian Jurors

The State exercised peremptory challenges against nine prospective African-American jurors. Kandies claims that six of these jurors — Randleman, Jinwright, Rawlinson, Hines, McClure, and Oliver — were struck despite being similarly situated to Caucasian jurors who were accepted by the prosecution. *See Bell v. Ozmint*, 332 F.3d 229, 241 (4th. Cir. 2003) ("[C]omparative juror analysis clearly is a relevant consideration in the *Batson* analysis" for determining whether the prosecutor's explanation was pretextual.), *cert. denied*, 124 S. Ct. 1155 (2004).

*Jurors Randleman and Jinwright*

The prosecutor articulated two reasons for striking Juror Randleman. First, in answering background questions posed by a questionnaire which prospective jurors completed in advance of jury selection, Randleman failed to disclose that she had been convicted of a criminal offense. Prior to voir dire, however, the prosecutor performed a criminal records check that revealed Randleman "ha[d] been convicted of worthless checks and two speeding violations." J.A. 131. Second, the prosecutor perceived Randleman to be "hesitant" when asked whether she had any feelings about the death penalty. J.A. 131.

With respect to Juror Jinwright, the State's proffered basis for exercising a peremptory challenge was Jinwright's former employment at a day care center where she cared for three- and four-year-old children. Moreover, the prosecutor believed, based on her voir dire testimony, that Jinwright, like Randleman, was "hesitant on the death penalty question." *Id.*

Kandies did not reply to the state's proffered reasons for using its peremptory strikes against Randleman and Jinwright. Thus, the trial court denied the *Batson* motion, finding that "the State has enunciated clear and logical bases and grounds for the exercise of peremptory

challenges and said grounds . . . are not for improperly racially discriminatory motives." J.A. 135.

On direct appeal to the North Carolina Supreme Court, Kandies argued "that the prosecutor passed several similarly situated white jurors," proving the pretextual nature of the State's explanation for its peremptory strikes against Randleman and Jinwright. *Kandies*, 467 S.E.2d at 75. The court concluded that Kandies' pretext argument was flawed with respect to Randleman and Jinwright because Kandies had simply picked "'a single factor among the several articulated by the prosecutor . . . and match[ed] it to a passed juror who exhibited that same factor.'" *Id.* at 75-76 (quoting *State v. Porter*, 391 S.E.2d 144, 152 (N.C. 1990)). The court explained that it had previously rejected such an approach to determining pretext under *Batson* as it "'fail[ed] to address the factors as a totality.'" *Id.* at 76 (quoting *Porter*, 391 S.E.2d at 152).

Kandies argues that the North Carolina Supreme Court's decision was unreasonable specifically because the State accepted prospective Caucasian jurors who expressed a hesitancy on the death penalty, but used the same factor as a basis for striking Randleman and Jinwright.

Even if Kandies were correct that various Caucasian jurors accepted by the State expressed virtually identical views about the death penalty as Randleman and Jinwright, this does not *a fortiori* demonstrate that Randleman and Jinwright were similarly situated such that the State's race-neutral reasons were necessarily pretextual. Indeed, "*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not." *Matthews*, 105 F.3d at 918. In *Bell v. Ozmint*, we held that a state court decision rejecting a *Batson* claim was not unreasonable where African-American and Caucasian jurors expressed similar views of the death penalty, but the State peremptorily struck only the African-American juror. The State offered two race-neutral reasons for its use of the peremptory challenge: the African-American juror's feelings about the death penalty and "the similarity in ages between [the juror's] children and [the defendant]." 332 F.3d at 241. Because the Caucasian juror did not have children of the same approximate age, the court concluded that the jurors were not similarly situated, despite the apparent similarity of their views on the death penalty. *See*

*id.* at 242; *see also Matthews*, 105 F.3d at 918 (finding Caucasian jurors were not similarly situated to African-American juror who was struck because of his views on the death penalty and his criminal record where there was no evidence "that any white juror seated had a criminal record.").

Kandies' argument fails to acknowledge that the prosecutor offered other reasons for striking these jurors even before mentioning that they were unsure about the death penalty. With respect to Randleman in particular, this argument utterly ignores the obvious and concrete distinction between her and the Caucasian jurors he claims were similarly hesitant about the death penalty. Randleman's juror information form indicated that she had not been convicted of a crime when, in truth, the State's record check listed convictions for writing bad checks and committing speeding violations. Unquestionably, a prospective juror's criminal record alone, even if there was no failure to disclose, is race-neutral on its face. *See Matthews*, 105 F.3d at 917-18. Kandies has not shown that any of the prospective Caucasian jurors he believes held similar views on the death penalty had a criminal record or, if so, failed to disclose it. I see no clear and convincing evidence that the State struck Randleman based on race.

Kandies counters that because the prosecutor did not introduce evidence of Randleman's criminal history, the basis articulated by the State was not supported by the record and cannot serve as justification for a peremptory strike. This argument, in my view, bungles *Batson*'s analytical framework. It implies that the State, in coming forward with its race-neutral justification at the second stage of *Batson*, bears some evidentiary burden.[4] That is not accurate. The State's burden at that stage is merely to articulate a facially neutral reason for having

---

[4]At least, this appears to me to be the thrust of his argument: "It is . . . *specious that the prosecutor relied on the purported criminal records of several prospective African-American jurors* when nothing in the record supported these naked assertions. Nothing in the record supported this explanation, as the prosecutor did not introduce any evidence about these purported records. The *State should not be permitted to justify its strikes with information not in the record*, especially when a defendant does not have access to this information." Brief of Appellant at 30 (emphasis added).

exercised a peremptory strike. The prosecutor, in other words, simply must come up with a reason "based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360. This is not a tall order, given that "[t]he second step of this process does not demand an explanation that is persuasive or even plausible." *Purkett*, 514 U.S. at 767-68. As long as the State comes up with a reason — anything other than a mere denial of discriminatory intent — it has done all that is required at the second stage. *See id.* at 769. Whether the trial court *believes* the reason actually motivated the prosecutor is a question that must be answered at the third stage of the *Batson* analysis, and even then it is the opponent of the strike who shoulders the burden of proof. *See id.* at 768. Thus, the State's reliance on Randleman's criminal history was a perfectly appropriate race-neutral reason for exercising a peremptory challenge, and it was Kandies, not the State, who was required to demonstrate otherwise. Kandies has not produced any clear and convincing evidence to rebut the state court's factual determination in this regard.

With respect to Jinwright, who was purportedly struck because of her former day care employment and her feelings about the death penalty, Kandies again claims that the State did not strike similarly situated Caucasian jurors. The prosecutor was concerned about the link between a prospective juror's employment and the Department of Social Services, explaining that defense counsel "is aware of some of the problems in this case involving Social Services and if we get into that I certainly do not want a juror that was involved in a Day Care or Social Services type work." J.A. 168. Only two of the prospective Caucasian jurors had worked in a school-type setting with young children — alternate jurors Arlington and Spence. In both cases, however, there were obvious reasons for the State to accept the jurors. In Arlington's case, her husband was a detective who had been on the job for 30 years. That this is an attractive factor for the prosecution — and one that makes her substantially dissimilar to Jinwright — is confirmed by the fact that Kandies challenged Arlington for cause and made clear that, had he not exhausted his allotment of peremptory strikes by that point in the trial, he would have excluded her. Spence testified that both her daughter and her parents were robbery victims, and that in both cases, the perpetrator was never found and brought to justice. She noted that she had been "very angry" about the crime against her daughter, but that she "probably" could be fair to both the

State and the defendant in a criminal case. J.A. 680. Again, Kandies' argument that Spence and Jinwright are so similarly situated is undercut by the fact that he exercised a peremptory strike against Juror Spence.

Kandies has not pointed to any clear and convincing evidence that would rebut the state court's finding that the prosecution did not strike jurors Randleman and Jinwright with discriminatory intent.

*Juror Hines*

The next of Kandies' *Batson* motions covered Juror Hines. Before exercising its peremptory challenge, the State moved to strike Juror Hines for cause after he indicated that he was the sole support for his family and the hardship imposed by jury service would impair his ability to serve. After the trial court refused to strike for cause, the State used a peremptory strike. Kandies again objected under *Batson*, arguing that, although Hines stated during voir dire that he held no strong feelings about the death penalty, he indicated he could consider either option in accordance with the court's instructions.

The prosecutor offered several reasons for excusing Hines: that Hines was worried about the loss of income that jury service would entail; that Hines claimed "he ha[d] never thought about the death penalty" before; that he failed to disclose on his juror questionnaire prior convictions for driving while impaired and driving without a valid license; and that during his voir dire testimony, he denied having a criminal history. J.A. 605.[5]

---

[5]At trial, Kandies responded by renewing his motion that the State be required to share any information it gathered from any criminal record check performed by the prosecution. Kandies pursued this issue on direct appeal, arguing that the State was required to produce "copies of all the criminal record checks for prospective jurors obtained by the prosecution." *Kandies*, 467 S.E.2d at 76. The Supreme Court of North Carolina held that this information was not subject to disclosure under North Carolina law, and that Kandies had the burden of proof and "had sufficient opportunity to produce evidence that the prospective jurors in question did not have criminal records." *Id.* at 77.

In rejecting this claim, the trial court noted two of the State's bases for its peremptory challenges — Hines' concern over missing work and his failure to disclose prior convictions — as well as the fact that two of the eight jurors that the State had accepted up to that point in the trial were African American. The trial court also noted that the State had accepted a third African-American juror, but Kandies used one of his own peremptory strikes to exclude that juror. On direct appeal, the North Carolina Supreme Court affirmed. *See Kandies*, 467 S.E.2d at 76.

Kandies now argues that the State did not strike two Caucasian jurors who were similarly situated to Hines because, like him, they expressed concerns about the impact of jury service on their employment. Again, this argument ignores the other race-neutral reasons articulated by the State. Kandies does not suggest that the Caucasian jurors who were concerned about their employment also had criminal records. Like juror Randleman, Hines is not similarly situated for purposes of a comparative juror analysis under *Batson*. *See Ozmint*, 332 F.3d at 241-42. Certainly, such evidence does not rise to the clear and convincing level required to rebut the presumption of correctness afforded the state court's determination that the State had no discriminatory motive in striking Hines. Moreover, for the reasons already stated with respect to Randleman, the State's failure to submit a copy of Hines's record into evidence had no bearing on whether the State adequately discharged its obligation to articulate an explanation that was neutral on its face.

*Juror Oliver*

During the selection of alternate jurors, the State exercised a peremptory strike of Juror Oliver, who was African-American. The State responded to Kandies' *Batson* motion by explaining that Oliver had difficulty hearing, as evidenced by her failure to follow the court's instructions to refrain from watching television or radio broadcasts about the trial. The prosecutor's primary concern was whether she would be able "to hear and understand me as this case goes along." J.A. 969. Kandies countered that the State had accepted Caucasian jurors who had not followed the court's preliminary instructions. The trial court rejected Kandies' argument that the jurors were similarly situated, finding persuasive the State's proffered reasons:

"the juror's apparent inability to hear the Court's instructions . . . and the juror's *obvious* inability to hear the questions of the District Attorney without requesting clarification on numerous occasions during the voir dire process." J.A. 970 (emphasis added).

The North Carolina Supreme Court rejected Kandies' *Batson* claim to the extent it was based on Oliver, specifically mentioning the trial court's own observation that Oliver was not able to respond to questions during voir dire without requesting clarification several times. *See Kandies*, 467 S.E.2d at 76.

Kandies argues that the State accepted a number of Caucasian jurors who failed to strictly follow the instructions of the trial court, which regularly admonished prospective jurors during the voir dire process to avoid exposure to media accounts of the trial. In support of his argument, Kandies specifies three Caucasian jurors who indicated that they either read a newspaper account or listened to a television report about the trial after the jury selection process had begun. Kandies also claims that the prosecutor failed to thoroughly question all of the Caucasian jurors on their level of media exposure.

Kandies' argument, at best, misperceives the nature of the State's concern, which was obviously Oliver's hearing. Oliver's numerous requests for the prosecutor to repeat his questions prompted the prosecutor to ask Oliver if she had difficulty hearing, to which she responded she did not hear very well and that "everybody's not talking loud enough." J.A. 967. The trial court's conclusion that there was no discriminatory intent was also obviously based on Oliver's inability to hear; the court mentioned her apparent failure to follow instructions as a *manifestation* of her hearing problem. *See Kandies*, 467 S.E.2d at 76. Kandies has not suggested that there were non-minority jurors who, like Oliver, could not hear or had difficulty following the proceedings but were accepted by the State nonetheless. In fact, the only other juror who apparently had hearing difficulty was Juror Massey, who was struck by the State because she "had trouble understanding" questions asked by the prosecutor during voir dire, "continuously answered with difficulty," and because the prosecutor could not easily understand her responses. J.A. 131.[6] Accordingly,

---

[6]Kandies argues that the prosecutor's belief that Massey could not easily understand the proceedings was a sham explanation for striking her

Kandies has not pointed to any jurors similarly situated to Oliver, except for race, who were treated differently by the State during its exercise of peremptory strikes. Thus, he has failed to come forward with clear and convincing evidence to rebut the state court's finding that there was no discriminatory intent.

*Jurors McClure and Rawlinson*

The prosecutor indicated that he struck Juror McClure because, among other things, a law enforcement officer present in the court-room noticed him sleeping at least two times. Kandies did not refute this assertion at trial, nor does he point to anything now that would suggest this race-neutral reason was pretextual. With respect to Juror Rawlinson, the prosecutor noted that she did not express during voir dire a strong opinion with regard to the death penalty. The prosecutor also indicated that he asked employees of the local police department whether they had any knowledge of anyone on the jury panel from whom the jury would be selected, and learned that neither Rawlinson nor McClure were thought to be a good choice for a capital murder trial jury:

> [PROSECUTOR]: . . . . I discussed the jury panel with the High Point Police Department, and they indicated Mr. McClure and Mrs. Rawlinson would not be good jurors for this type of case.
>
> THE COURT: Do you want to elaborate on that, please?

and was not supported by the record because "Massey only asked the prosecutor to repeat one question, and the prosecutor never asked her to repeat any of her answers." Brief of Appellant at 29. This observation falls dramatically short of the clear and convincing evidence Kandies must produce to overcome the presumptive correctness of the state court's factual determination that there was no discriminatory intent. *See* 28 U.S.C.A. § 2254(e)(1). Here, in particular, we should be wary of sub-stituting our judgment, based on the bare transcript, for that of the state trial court, who was present during the proceedings and observed this prospective juror first-hand. *See Evans v. Smith*, 220 F.3d 306, 316 (4th Cir. 2000).

[PROSECUTOR]: Your Honor, I asked most everybody and basically indicated anyone that they had any contact with prior to the trial. Primarily, the reason was that they were weak on the death penalty question.

J.A. 167-68. Kandies did not object to the sufficiency of this particular reason offered by the State for using peremptory strikes against McClure or Rawlinson, nor did he request any further explanation from the State with respect to this basis.

The trial court concluded that the bases offered by the prosecutor were valid and found that these prospective jurors were not struck by the State on the basis of race. On appeal, the North Carolina Supreme Court held that the reasons offered by the State were valid and that the trial court did not err in concluding that the exercise of peremptory challenges against McClure and Rawlinson was not "motivated by impermissible racial discrimination." *Kandies*, 467 S.E.2d at 76.

Because the prosecutor used their responses to questions about the death penalty as one of the bases for striking them, Kandies argues that McClure and Rawlinson also were subject to disparate treatment, as evidenced by the State's acceptance of Caucasian jurors who were similarly situated because of weak or ambivalent views on capital punishment.

With respect to McClure, Kandies has not pointed to anything in the record to suggest that there were Caucasian jurors that the State accepted even though they were nodding off in court or unable to pay attention. Once again, Kandies has simply ignored a race-neutral reason that clearly distinguishes the stricken juror from others accepted by the State.

With respect to Rawlinson, there was no other prospective juror, except for McClure, who the State struck based on the juror's prior contact with employees of the local police department and the employees' impressions of the juror's feelings about capital punishment. Again, this undercuts Kandies' "similarly situated" argument.

Kandies counters that the prosecutor's purported reliance on the opinion of local police personnel, based on prior contact, that Rawlin-

son and McClure were weak on capital punishment was insufficient to provide a race-neutral basis for striking Rawlinson and McClure. Kandies argues that this explanation was "little more than a hunch, and the very type of explanation that is *inherently* suspect." Brief of Appellant at 29 (emphasis added). Although this argument lacks precision, it appears clearly to be directed at step two of the *Batson* analysis, which is satisfied as long as the State does not offer a reason in which "discriminatory intent is *inherent*." *Hernandez*, 500 U.S. at 360 (emphasis added). Indeed, Kandies argues that the basis articulated by the prosecutor was "*legally insufficient* to survive a *Batson* challenge." Brief of Appellant at 29 (emphasis added). At step two, the trial court examines the prosecutor's explanation to determine whether, "as a matter of law," it is a valid race-neutral reason on its face. *Id.* at 359.

Specifically, then, Kandies argues that reliance on feedback from the local police department cannot constitute a race-neutral basis because it is nothing more than an undefined "feeling" about a prospective juror. Brief of Appellant at 29. *Cf. United States v. Horsley*, 864 F.2d 1543, 1546 (11th Cir. 1989) (per curiam) (rejecting prosecutor's explanation that he "just [had] a feeling about him"). *But see United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993) (per curiam) (stating that a prosecutor's intuition, standing alone, is a sufficient race-neutral reason for purposes of *Batson*).

*Batson* instructs that the State must rebut a *prima facie* case by articulating "a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Batson*, 476 U.S. at 98 n.20 (internal quotation marks omitted). Subsequent decisions clarified the limited nature of this requirement, which was imposed to prevent a prosecutor from "satisfy[ing] his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith." *Purkett*, 514 U.S. at 769. Certainly, the explanation given by the prosecutor here is sufficient to satisfy *Batson*'s modest race-neutral requirement. It is specific and reasonably related to the case; it need not be "persuasive, or even plausible." *Id.* at 768. On its face, the proffered explanation is "based on something other than the race" of the prospective jurors, which is all that is required. *Hernandez*, 500 U.S. at 360. I note my concern, however, about this type of reason as it is virtually impossible for the defense

to effectively challenge. Nevertheless, under the circumstances of this case, I cannot say that the state court's decision was contrary to, or an unreasonable application of, *Batson* or its progeny.

### B.   Other Evidence of Discriminatory Intent

Kandies' next argument is that the trial court ignored statistically significant evidence that supported a finding of discrimination. Specifically, he contends that

> [t]he prosecutor exercised fifteen peremptory challenges, nine of which were directed against African Americans. When Kandies objected to each of them, the trial court did not determine if a prima facie case had been presented. Rather, the prosecutor simply volunteered explanations for these challenges. The trial court then decided if these explanations were race-neutral. By proceeding in this fashion, the trial court never judged the strength of Kandies' prima facie case. In other words, the trial court neither considered the number of strikes the prosecutor exercised against African Americans nor evaluated the dramatic difference in the percentages of strikes against African Americans as opposed to whites. Because it never determined the strength of the prima facie case, the trial court could not factor it into the ultimate determination . . . contrary to *Batson*.

Brief of Appellant at 22-23. Kandies supports his claim of statistical disparity by explaining that the prosecutor used peremptories on eight of eleven otherwise qualified African-American jurors (73%), but that he used peremptory challenges on only four of twenty-six (15%) prospective Caucasian jurors. Kandies contends that the trial court was required to, but did not, "weigh the asserted [race-neutral] justification against the strength of [his] prima facie case under the totality of the circumstances." *United States v. Hill*, 146 F.3d 337, 342 (6th Cir. 1998).

Kandies bases this argument primarily on language in *Miller-El* suggesting that the ultimate determination of whether, "despite the neutral explanation of the prosecution, the peremptory strikes . . . were race based" should include "the facts and circumstances *that*

*were adduced in support of the prima facie case.*" *Miller-El*, 537 U.S. at 340 (emphasis added). The Court concluded that the district court failed to consider fully petitioner's *prima facie* evidence that prosecutors struck "91% of the eligible African-American venire members" — which was alone enough to create a sufficiently debatable *Batson* issue that warranted a certificate of appealability under § 2253. *Id.* at 342.

To me, it appears that Kandies' argument encompasses two discrete contentions based on these snippets from *Miller-El*. Because Kandies never presented any statistical evidence to the state trial court in support of his *Batson* challenges (so far as I can tell), Kandies' argument would mean, first, that a state trial court could not properly skip the first step in *Batson*, requiring a determination of whether a *prima facie* case had been made. It bears repeating that it was perfectly acceptable under the circumstances for the trial court to bypass any specific analysis of whether Kandies had establshed a *prima facie* case. As the Supreme Court has explained, and this court has reiterated, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359; *see Bell*, 332 F.3d at 240 n.5. Moreover, Kandies, who would have benefitted from not having to clear the first *Batson* hurdle, never insisted at trial that the court make a *prima facie* determination rather than proceeding as if a *prima facie* showing had been made. For him to suggest now that the trial court was derelict for not having done so strikes me as disingenuous.

Kandies' argument would also alleviate his burden of proof to a certain extent. *Miller-El*, however, does not alter the three-step *Batson* analysis or its allocation of the burden of proof to the opponent of the peremptory strike. Rather, it confirms that statistical evidence of a discriminatory pattern of peremptory strikes is relevant to a *prima facie* case. *See Batson*, 476 U.S. at 96-97; *see also Howard v. Moore*, 131 F.3d 399, 407 (4th Cir. 1997) (en banc). Although Kandies was not actually required to make a *prima facie* case here, neither was he prohibited from adducing evidence that bolstered his allegations that the State was striking African-Americans because of their race. Technically, what he is suggesting is that the trial court take into consider-

ation evidence that he could have used, but did not, to support a *prima facie* case. I am not aware of such a requirement in *Miller-El* or any other case. In fact, the very language Kandies relies on indicates that the trial court should consider facts "adduced" in support of a *prima facie* case.

Moreover, although the trial court was not presented with statistical evidence, the record reveals that the trial court did consider, following each round of peremptory strikes, the number of strikes exercised against African-American jurors vis-a-vis Caucasian jurors. For example, after the first round of peremptory strikes by the State, the trial court prefaced its ruling on Kandies' Batson motion by noting that the State "exercised six peremptory challenges, . . . three [of which] . . . have been exercised as to the members of the black race." J.A. 135. After the second round of strikes, the trial court prefaced its ruling as follows: "[F]ollowing the exercise of the State's first [six] peremptory challenges . . . six replacement jurors [were] called, three by their questionnaires indicated that they were members of the Black race. . . . The District Attorney has passed one of the prospective jurors called as a replacement juror who is a member of a minority race and had peremptorily excused [the other] two [African-American jurors]." J.A. 168A. In both cases, as discussed in detail above, the court went on to find that the State had articulated a valid basis for striking each of the African-American jurors and, ultimately, that the peremptory strikes had not been exercised on the basis of race.

In sum, this does not constitute the clear and convincing evidence needed to rebut the presumption of correctness enjoyed by the state court's finding that there was no discrimination.

Finally, Kandies contends that the trial court ignored the prosecutor's alleged personal history of purposely excluding prospective minority jurors on the basis of race. This "evidence" was nothing more than a conclusory statement by defense counsel that he had never in the past seen the prosecutor leave a minority panel member on the jury. He cites *Miller-El* in support, but a bare, unsubstantiated statement by defense counsel is nothing like the extensive testimony in *Miller-El* about the history of discrimination and the official policy adopted by the district attorney's office to exclude minorities from jury duty. *See Miller-El*, 537 U.S. at 334-35. In short, defense coun-

sel's comment is insufficient to rebut the trial court's factual determination by clear and convincing evidence.

## C. Conclusion

In sum, I cannot say that the state court's decision rejecting Kandies' *Batson* claim was contrary to, or involved an unreasonable application of, clearly established federal law, nor can I say that this decision was based upon an unreasonable factual determination.

## V.

For the foregoing reasons, I concur in the result reached by Judge Gregory on both the ineffective assistance claim and the *Batson* claim.